AT & T UNIVERSAL CARD SERVICES
CORP., Plaintiff,

v.

Peter SEARLE, Defendant.

No. CIV. A. 98–10337–WGY.

United States District Court,
D. Massachusetts.

July 9, 1998.

Mark Lindner, Law Office of Mark Lindner, Needham, MA, for Appellant.

Alan R. Finer, Vineyard Haven, MA, for Appellee.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

In a Chapter 7 bankruptcy proceeding, the Creditor–Plaintiff AT & T Universal Card Services ("Universal") filed a complaint against the Debtor–Defendant Peter Searle ("Searle") pursuant to 11 U.S.C. § 523(a)(2)(A), seeking to except from discharge $8500 in cash advances through Searle's use of his AT & T Universal credit card in October, 1996. The Bankruptcy Court held the debt dischargable. Universal appeals. The essence of its appeal is that the Bankruptcy Court erred as matter of law in determining that Searle's taking of the cash advances did not constitute actual fraud. It argues that Searle lacked the ability to repay the advances, had engaged in credit card kiting, and did not have a reasonable intent to repay.[1]

---

1. In its notice of appeal, Universal raises the following issues:

1. Did the bankruptcy judge err in finding that Universal relied upon nothing in extending or continuing to extend credit to Searle;

386

## STANDARD OF REVIEW

This appeal is timely filed and this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158(a). In reviewing the decision of the Bankruptcy Court on appeal, a district court shall not set aside findings of fact unless clearly erroneous. Fed. R. Bankr.P. 8013. All conclusions of law, however, are subject to de novo review. *La-Roche v. Amoskeag Bank,* 969 F.2d 1299, 1301 (1st Cir.1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Particular deference to the factual findings of the Bankruptcy Court is appropriate on questions of intent "because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." *Palmacci v. Umpierrez,* 121 F.3d 781, 785 (1st Cir.1997); *see also* Fed. R. Bankr.P. 8013 ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

## DECISION OF THE BANKRUPTCY COURT

At the trial on the complaint, Catherine O'Neil, the investigations manager of Universal's Corporate Security, and Searle testified. Following this testimony, the Bankruptcy Court gave an oral decision and entered judgment for Searle. The court found Searle to be a credible witness and determined, based on the evidence presented, that when he obtained the cash advances with his AT & T credit card, he intended to repay Universal. The court characterized Searle's state of mind at the time he obtained the cash advances as follows:

> The critical factor is that the debtor had just obtained employment after a long period of unemployment when he had been, by his own admission, living off his credit cards, and it is uncontradicted that he felt that this new job with fifty to sixty hours of work a week at $15 an hour with lots of guaranteed overtime would pull him out of the hole in which he was deep.

Trial Tr. at 68.

The court found this expectation reasonable and, therefore, concluded that Searle did not commit actual fraud on Universal when he took the two cash advances in October 1996. Also, the court held that, even though Searle was taking cash advances from one credit card to pay back another, Universal could not justifiably rely upon an expectation that a credit card holder such as Searle would not engage in such conduct to stave off the due date of his indebtedness, and indeed could not justifiably rely on **any** of Searle's conduct following his execution of the cardholder agreement. Trial Tr. at 69. As Universal failed to provide sufficient evidence to satisfy at least two of the elements of actual fraud (i.e., actual intent and justifiable reliance), the court concluded that section 523(a)(2)(A) did not preclude the discharge of Searle's $8,500 debt to Universal.

## FACTS

A review of the facts of this case, based on the transcript record, is necessary in order to determine whether the Bankruptcy Court's factual findings are clearly erroneous.

### 1. AT & T Universal Credit Card Transaction History

In 1992, following his separation from his wife, Searle reapplied for a credit card from

---

2. Did the bankruptcy judge err in finding that Searle had an intent to repay;

3. Did the bankruptcy judge err in finding that the reasonableness of Searle's intent to pay was not a consideration;

4. Did the bankruptcy judge err in finding that credit card kiting was not relevant to the fraud issue in this action, even though, the court stated that Searle engaged in credit card kiting?

5. Did the bankruptcy judge err in not taking into consideration the totality of the circumstances and, therefore, entering a finding for Universal [sic];

6. Did the bankruptcy judge err in finding intent or reasonable intent to repay when the testimony was Searle did not have the ability to repay;

7. Did the bankruptcy judge err in accepting as true Searle's claimed intent to repay when the testimony was that Searle did not have the ability to repay and Searle's testimony showed that Searle knew or should have known his professed intent to repay was not reasonable.

Universal in his own name. At that time, he was employed as a well-driller earning $55,000 annually and owned a house. After reviewing his application and credit history, Universal gave Searle a favorable credit score of 915[2] and issued him a credit card with a $9000 credit limit. Universal considered Searle to be a good cardholder. Prior to the transactions at issue, Searle had not defaulted, any late payments were made up, and he never exceeded his credit limit. From 1992 to 1995, his credit card balance varied from $100 to $6000–8000 dollars and was regularly paid down. Universal offered no evidence that Searle's borrowing pattern in 1995–1996 was different from his borrowing practices in 1992–1995.

In September, 1996, Searle paid $2919 on his credit card, reducing the balance to $186. In October, 1996, he made a payment of $10.00. On October 23, 1996, he obtained a cash advance of $4000 and on October 31, 1996, a cash advance of $4500. The resulting balance was $8,797.98. Searle made no further payments on this credit card account after these cash advances, nor did he use the account.

## 2. Searle's Employment and Financial Status

In 1994, Searle injured his back while working, suffering a slipped disk. As a result of the injury, he was unable to work and obtained a worker's compensation settlement. With the settlement money, he paid down his credit cards and attempted to pay for his living expenses until he was able to obtain employment.

After his injury, while he was still unable to find steady work, Searle borrowed from his credit cards to meet his living expenses. He testified that for about a year and a half he "borrowed from one credit card, deposited it into my checking account and wrote a check to pay back another one to maintain my credit or to maintain minimum payments. . . ." Trial Tr. at 39. In total, he took nearly $30,000 in cash advances. He did this not to obtain additional credit but in order to protect his credit rating. He continued to

engage in this conduct, even though he knew his expenses exceed his income.

In 1995, Searle had earned income of $9700. For most of 1996, Searle had sporadic employment. His total earned income was $6500 with the majority of this income coming from his work as a well-driller during the last three months of the year. In 1996, in order to pay living expenses and to service his credit card debt, he liquidated his IRA. The value of his IRA was $8220.

In August, 1996, Searle's parents loaned him $3000. He used a portion of this loan—$2919—to pay down the balance on his Universal credit card in order to be able to borrow money from the card in the future, if necessary.

In October, 1996, he obtained a job with a bulk drilling company on Martha's Vineyard called Sarusa Drill Company. When he accepted the job, he was told that he would be earning $15 per hour with 40 hours per week of guaranteed work as well as substantial overtime such that his average work week would be fifty to sixty hours. This job was almost identical to the type of work Searle had when earning $55,000 annually. He obtained this job prior to taking the cash advances.

At the trial, Searle testified that he took the $4000 cash advance in order to pay legal expenses and the other $4500 to pay overdue rent and repay loans from family and friends. The cash advance was not used to pay credit card debts. He testified that he hoped his re-employment would enable him to become financially stable. He took the cash advances believing that he would have no trouble repaying them due to his new job. Trial Tr. at 51–53; 55. Searle testified that prior to obtaining this job, he had not contemplated filing for bankruptcy in order to deal with his mounting credit card doubt, "because I had faith in myself that something would happen and I'd be able to turn everything around." Trial Tr. at 54. In order to avoid bankruptcy, he borrowed money from his family, friends, and credit cards.

In February, 1997, Searle was laid off from his job. He was informed of the pending lay

2. The minimum credit rating score was 680.

off by his employer in early January. At that point, he consulted an attorney. His attorney proposed filing for bankruptcy. Searle waited several weeks to see if work would pick up. It did not. He signed his bankruptcy petition on January 31, 1997 and filed it on February 7, 1997.

## DISCUSSION

### A. The Legal Framework Under Section 523(a)(2)(A)

█ Section 523(a) of the Bankruptcy Code delineates various exceptions to discharge under a Chapter ·7, 11, 12, or 13 bankruptcy petition. Section 523(a)(2)(A) excepts from discharge "any debt for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, false representations, or actual fraud, other than a statement respecting the debtor's or insider's financial condition." Consistent with the fresh-start policy of the Bankruptcy Code, exceptions to discharge are narrowly construed and, therefore, the creditor bears the burden of showing that a particular debt "comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." *Century 21 Balfour Real Estate v. Menna*, 16 F.3d 7, 9 (1st Cir.1994). "The statutory requirements for a discharge are 'construed liberally in favor of the debtor' and '[t]he reasons for denying a discharge to a bankrupt must be real and substantial not merely technical and conjectural." ' *Palmacci*, 121 F.3d at 786 (quoting *Boroff v. Tully*, 818 F.2d 106, 110 [1st Cir.1987]).

In *Field v. Mans*, 516 U.S. 59, 69–71 & n. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), a case dealing with the level of actual reliance a creditor must establish to show actual fraud and prevent discharge, the Supreme Court " 'construe[d]' the terms in § 523(a)(2)(A) to incorporate the general common law torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State."

Under the common law, a debtor is liable for actual fraud or fraudulent representation if:

1) He made a representation;

2) At the time of the representation, he knew it to be false;

3) He made the representation with actual intent to deceive the creditor;

4) The creditor justifiably relied on the representation and the reliance was reasonably founded; and

5) The creditor sustained a loss or damage caused by this false representation.

4 *Collier on Bankruptcy* § 523.08[1][e]; § 523.08[6] (Lawrence P. King ed., 15th ed.1998).[3]

█ In order to except its claim from discharge, Universal must establish by a preponderance of the evidence each element of actual fraud. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Palmacci*, 121 F.3d at 787 ("The burden of proof and the burden of production as to each element rests with the party contesting the dischargeability of a particular debt under Bankruptcy Code § 523.").

### B. Applying Section 523(a)(2)(A) to Credit Card Debt

#### 1. False Representation

Because a credit card debtor does not have a face-to-face encounter with the credit card issuer at the inception of each transaction, courts have disagreed concerning whether a credit card purchase or cash advance constitutes a representation. *Compare Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir.1996) ("the necessary element of a representation made by the debtor is present in the implied representation of an intent to perform the unilateral contract by repaying the amount charged."), *Essex Bank v. Bono (In re Bono)*, 41 B.R.

---

**3.** The First Circuit has articulated the following test for false representation which also can be applied to this situation:

> If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not

dischargable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at that time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Palmacci*, 121 F.3d at 787.

629 (Bankr.D.Mass.1984), and *Chevy Chase Bank v. Briese (In re Briese)*, 196 B.R. 440 (Bankr.W.D.Wis.1996), *with The GM Card v. Cox (In re Cox)*, 182 B.R. 626 (Bankr. D.Mass.1995) (holding that a credit card transaction does not represent an implied representation of an intent to pay). To address this issue, courts have developed various theoretical frameworks to determine whether a representation occurs. One approach is the "implied representation" theory. Under this theory, a credit card holder impliedly represents, upon using the credit card, that he has the ability and intention to pay for the goods or services obtained. *See, e.g., Household Card Services/Visa v. Vermillion (In re Vermillion)*, 136 B.R. 225, 226 (Bankr.W.D.Mo.1992) (citing cases); *Citicorp Credit Services, Inc. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1021 (Bankr.D.N.D. 1990) (citing cases). This analysis is pro-creditor and tends towards a determination that a particular credit card transaction is not dischargable. On the other hand, some courts have adopted an "assumption of risk" theory. *E.g. First Nat'l Bank v. Roddenberry*, 701 F.2d 927, 932–33 (11th Cir.1983). Under the "assumption of risk" theory, a card holder makes a false representation to the issuer only when revocation of the card is communicated to the card holder and the card holder continues to use the card. Under this theory, only the post-revocation transactions are non-dischargable and it is likely that a majority of credit card transactions would be dischargable. This approach is pro-debtor.

Universal argues for the application of the "implied representation" theory.

This Court does not adopt either theory, as both run counter to the core objectives of the Bankruptcy Code. "[A] central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan*, 498 U.S. at 286, 111 S.Ct. 654. This fresh-start is available only to the "honest and unfortunate debtor." The "implied representation" theory disadvantages the honest but unfortunate debtor while the "assumption of risk" theory advantages the dishonest and deceptive debtor. Moreover, both theories, in application, minimize the other common law elements of actual fraud.

█ A more grounded approach conceptualizes each transaction as a unilateral contract where "the cardholder promises to repay the debt plus to periodically make partial payments along with accrued interest and the card issuer performs by reimbursing the merchant who has accepted the credit card in payment or advancing the cash." *In re Anastas*, 94 F.3d at 1285 & n. 2. This approach is consistent with the notion that a representation can be made by words or conduct and recognizes representation as inherent in the transaction, *see* Restatement (Second) of Torts, § 525 cmt. b (1976); *see also In re Briese*, 196 B.R. at 450 ("[A]lthough the debtor may not speak directly to the credit card issuer when making a purchase or obtaining a cash advance, there is little doubt that the debtor makes a representation—namely, the promise to pay credit advanced."). Using this approach, it is clear that Searle made a representation to repay the cash advances when he took them. But this is not the end of the inquiry. The remaining elements of common law fraud must be established by a fair preponderance of the evidence: i.e., 1) falsity, 2) actual intent to deceive, 3) justifiable reliance, and 4) proximate injury.

In this case, the Bankruptcy Court focused its inquiry on the elements of actual intent to deceive and justifiable reliance. Because the court found that Universal failed to establish each of these elements by a fair preponderance of the evidence, the debt was determined dischargable.

**2. Actual Intent**

█ Universal argues that Searle's inability to repay the debt is proof that he did not have the intent to repay at the time he took the cash advances and, therefore, his representation was fraudulent. This argument fails for several reasons. First, the language of section 523(a)(2)(A) specifically excludes from consideration of whether conduct is actual fraud "a statement respecting

the debtor's or an insider's financial condition." As noted in *In re Anastas:*

> [T]he representation made by the card holder in a credit card transaction is not that he has an ability to repay the debt; it is that he has an intention to repay. Indeed, section 523(a)(2) expressly prohibits using a non-written representation of a debtor's financial condition as a basis for fraud. Thus, the focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges. A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of non-dischargeability of credit card debt. Rather, the express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt. A finding that a debt is non-dischargable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law.

94 F.3d at 1285–86.

■ Second, even though a court could consider Searle's financial condition in inferring actual intent to deceive, this factor may not be the sole consideration. *In re Anastas,* 94 F.3d at 1286; *see also* 4 *Collier Bankruptcy, supra,* § 523.08[6]. Actual fraud is to be determined based on the totality of the circumstances. *Palmacci,* 121 F.3d at 789 ("[W]hile fraud may not be implied in law, it may be inferred as a matter of fact. The finder may 'infer[ ] or imply[ ] bad faith and intent to defraud based on the totality of the circumstances when convinced by a preponderance of the evidence.' " [quoting *In re Anastas,* 94 F.3d at 1286 n. 3] ); *see also*

*Rembert v. AT&T Universal Card Services, Inc.,* 141 F.3d 277, 282 (6th Cir.1998).[4]

■ Contrary to Universal's assertion, the actual intent element of common law fraud cannot be established by showing that a debtor knew or should have known that he did not have the money available to fulfill his promise. The correct focus, rather, is whether in good faith he **intended** to keep his promise. *Palmacci,* 121 F.3d at 788. The negligence standard is not applicable to the fraudulent intent inquiry because the objective "reasonable person" standard does not apply in assessing the debtor's belief with respect to the intentional tort of fraud. *Id.; see also In re Briese,* 196 B.R. at 451. "An honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit. A 'dumb but honest' defendant does not satisfy the test of scienter." *Palmacci,* 121 F.3d at 788. Instead, "a finding that a debt is non-dischargable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud implied by law." *Id.* (quoting *In re Anastas,* 94 F.3d at 1286 & n. 3).

■ Here, Searle believed that his new job, given its hourly rate and the number of hours of work per week as represented to him by his employer, would be sufficient to enable him to service the debt created by taking the two cash advances. The Bankruptcy Court found this testimony credible and reasonable. This Court is to give deference to the credibility determinations of the Bankruptcy Court due to its ability to assess the demeanor of the witness.

Both at trial and on appeal, Universal attempts to challenge the credibility of Searle's testimony. First, Universal points to several of his answers to prior interrogatories. The Bankruptcy Court considered these differences but did not find them substantive. Searle's statement in the interrogatories that

---

4. In the credit card context, courts have found this totality of circumstances analysis upon twelve, nonexclusive factors relating to the debtor's intent to deceive. These factors were first articulated in *Citibank South Dakota v. Dougherty,* 84 B.R. 653, 657 (9th Cir. BAP 1988). Some courts have used these factors for the entire actual fraud analysis rather than in determining the element of actual intent. This approach is contrary to the approach outlined by the Supreme Court in *Field v. Mans* or the First Circuit in *Palmacci v. Umpierrez* which requires application of all of the common law elements of actual fraud in order to determine whether a debt is excepted from discharge.

he used part of the second cash advance to pay rent, legal fees, travel for visitation to his child, and necessities did not preclude also using the funds to pay down his debt. In his trial testimony, he stated that the rent payments were for overdue rent and the legal fees were for services already rendered. This testimony is not sufficiently contradictory as to raise a compelling question about credibility.

■■■ Second, Universal focuses on the failure of Searle to make any minimum payments after the cash advances. Universal argues that this action is inconsistent with Searle's statement of his intent to repay. This Court disagrees. An initial representation is not false because of a subsequent decision not to fulfill the promise. *Palmacci,* 121 F.3d at 787 (citing *In re Anastas,* 94 F.3d at 1285). As nothing in the testimony suggests that Searle intended not to repay the cash advances **at the time that he took each advance,** the Bankruptcy Court's finding of credibility as to this testimony is not clearly erroneous.

### 3. Justifiable Reliance

As an alternative basis for concluding that there was no actual fraud, the Bankruptcy Court found that there was no justifiable reliance on the part of Universal with respect to any of Searle's conduct. Universal disputes this conclusion, arguing that the Bankruptcy Court has employed the faulty reasoning of *In re Cox* which has been rejected in subsequent district court decisions. *See AT & T Universal Card Service Corp. v. Nguyen,* 208 B.R. 258 (D.Mass.1997) (Stearns, J.) (criticizing the analysis of *In re Cox* because it always results in a granting of discharge); *AT & T Universal Card Serv. Corp. v. Pakdaman,* 210 B.R. 886, 887 (D.Mass.1997) (Ponsor, J.) ("While recognizing that the application of traditional elements of misrepresentation to the credit card area is tricky, this court must conclude that *Cox* strikes the balance too harshly against the creditor.").

In *In re Cox* the Bankruptcy Court held that there was no reliance on the part of a credit card issuer based on the debtor's particular cash advance transaction, because there had been no relevant prior representa-

tion. The court reasoned that the only representation upon which the credit card issuer justifiably could rely was the representation made at the beginning of the credit relationship when the credit card issuer agreed to extend credit to the cardholder based on the promise to pay as outlined in the cardholder's agreement. The *Cox* court concluded that there was no subsequent representation to the credit card issuer that could be inferred from a credit card transaction that did not directly involve the credit card issuer. The court held that "It is unrealistic to infer from the Debtor's transaction with the bank an implied representation of intent to pay GM, an absent party.... A credit card transaction involves no reliance upon an implied representation of intent to pay." *In re Cox,* 182 B.R. at 636–37. The problem with this reasoning, like the "assumption of risk" theory, is that it results in the granting of discharge to dishonest and deceptive debtors contrary to the objectives of the Bankruptcy Code.

■■■ A more balanced reliance analysis has been crafted by the Ninth Circuit. *See Citibank (S.D.), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1091 (9th Cir.1996). Under this approach, "the credit card issuer justifiably relies on a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable." *In re Anastas,* 94 F.3d at 1286 (citing *In re Eashai,* 87 F.3d at 1091). This reliance analysis recognizes the unique nature of credit card transactions, the ability of a cardholder to mask an actual financial condition by making minimum payments from whatever sources, and the credit card issuer's lack of access to the cardholder's present financial condition at the point of each transaction.

In *Field v. Mans,* the Supreme Court held that a creditor's reliance on a debtor's misrepresentation need be only justifiable, not reasonable, to except a debt from discharge under section 523(a)(2)(A). 516 U.S. 59, 116 S.Ct. 437. Under common law, "[i]n order for reliance upon a statement of intention to be justifiable, the recipient of the statement must be justified in his expectation that the

intention will be carried out. If he knows facts that will make it impossible for the maker to do so, he cannot be justified in his reliance." Restatement(Second) of Torts § 544 cmt. c.

■ Here, Universal conducted quarterly reviews of Searle's account to ensure continued creditworthiness. Prior to his default, these reviews indicated continued creditworthiness. There was no contradictory evidence available to Universal. Searle never reported to Universal the changes in his financial condition. Nevertheless, the Bankruptcy Court held Universal could have no justifiable reliance upon Searle's conduct. This was error. Universal's regular review of Searle's account and the lack of any information regarding the change in his financial situation constitutes, as matter of law, justifiable reliance on the part of Universal upon Searle's "representation of intent to repay." *In re Anastas,* 94 F.3d at 1286.

Even so, the Bankruptcy Court's error in its analysis of justifiable reliance does not cause this Court to reverse the judgment of dischargeability. In order for Universal to prevail under section 523(a)(2)(A), it had to establish **each** element of actual fraud by a preponderance of the evidence. *See Grogan,* 498 U.S. at 291, 111 S.Ct. 654. As the Bankruptcy Court's factual finding anent Searle's actual intent to deceive was not clearly erroneous, that court's conclusion that there was no actual fraud is proper because a requisite element was not proven.

### B. Credit Card Kiting

Universal's final argument is that the Bankruptcy Court erred in finding that Searle had engaged in credit card kiting but then failed to conclude, as matter of law, that such conduct constituted actual fraud. In support of its argument, Universal relies on *In re Eashai* where the Ninth Circuit held that credit card kiting is actual fraud. 87 F.3d at 1088. The Ninth Circuit held that credit card kiting occurs when a debtor "uses cash advances on one credit card to make the minimum payments on another credit card **and** has no intention to pay for the money, property or services received...." *Id.* (emphasis added).

The facts of *In re Eashai* are similar to this case. Like Searle, Eashai injured his back at work and became unemployed. While unemployed he used cash advances from various credit cards to meet his living expenses and to pay the minimum payments on other credit cards. But, unlike Searle, Eashai had no immediate prospect of full-time employment, used his credit for speculative investment purchases, and dramatically altered his spending habits after becoming unemployed. Based on these facts, the Bankruptcy Court there inferred that the debtor intended to defraud the creditor in making his credit card purchases and cash advances; therefore, his use of cash advances from one credit card to make the minimum payment on another credit card constituted "credit card kiting." Here, because the Bankruptcy Court found that Searle intended to repay the cash advances when he took them, his conduct does not constitute credit card kiting as defined by the Ninth Circuit. It is of no moment that the Bankruptcy Court here referred to Searle's conduct as "credit card kiting." The court's subsidiary findings concerning Searle's intent to repay bolsters the ultimate conclusion that there was no actual fraud.

### CONCLUSION

This Court **AFFIRMS** the judgment of the Bankruptcy Court. The two cash advances were taken with the intent to repay Universal because actual fraud under section 523(a)(2)(A) is determined based on a subjective standard of reasonableness not an objective "reasonable person" standard, the ability to pay may only serve as an inference of an intent not to repay, and Searle did not engage in credit card kiting (as defined by the Ninth Circuit) because he intended to repay his cash advances. Thus, the debt owed to Universal is dischargeable, as there was no actual fraud or credit card kiting or false representation. The exception to discharge provision of section 523(a)(2)(A) does not apply to this debt.