**In re Edmund F. DIETZEL, Debtor.**

**AT & T Universal Card Services Corporation, Plaintiff,**

**v.**

**Edmund F. Dietzel, Defendant.**

**Bankruptcy No. 98–12844.**
**Adversary No. 98–1979.**

United States Bankruptcy Court,
D. Massachusetts.

March 7, 2000.

Mark Linder of Linder & Associates, Needham, MA, for Plaintiff.

Donald J. Bertrand, Alford & Bertrand, P.C., Watertown, MA, for Defendant.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Complaint filed by AT & T Universal Card Services Corporation ("AT & T") against Edmund F. Dietzel (the "Debtor") under 11 U.S.C. § 523(a)(2)(A). AT & T seeks a determination that a debt owed to it in the sum of $4,144.41 resulting from the Debtor's use of an AT & T credit card for small purchases and cash advances is nondischargeable due to the Debtor's fraud. In a nutshell, the issue presented is whether the Debtor was a credit card kiter who had no intention of repaying AT & T at the time he used his AT & T card and, thus, is not entitled to the discharge of his debt to AT & T.

The Court conducted a trial on January 16, 2000 at which two witnesses, the Debtor and Ronald Lewis, a bankruptcy specialist for AT & T, testified, and one exhibit was submitted into evidence. The Court now makes its findings of facts and rulings of law in accordance with Fed. R. Bankr.P. 7052.

## II. FACTS

The Debtor filed a voluntary petition under Chapter 7 on March 24, 1998. He signed the petition approximately five weeks earlier on February 14, 1998. On Schedule A–Real Property, he listed a 100% ownership interest in property located on 27 Turner Street, Dedham, Massachusetts, which he valued at $190,000.00. On Schedule B–Personal Property, he listed $50.00 in cash; a Fleet Bank account

with a balance of $200.00; "furnishings" with a value of $2,000.00; CDs and a watch with a value of $300.00; clothes with a value of $300.00; and two automobiles: a 1997 Dodge Caravan and a 1997 Nissan Altima with values of $16,500.00 and $18,000.00, respectively. The Debtor did not list any computers or computer equipment on Schedule B. On Schedule C, he claimed exemptions in the Dedham property and in his personal property.

With respect to his debts, on Schedule D–Creditors Holding Secured Claims, the Debtor listed two mortgages on the Dedham property: a first mortgage to Country Wide Home Loans in the amount of $122,365.44 and a second mortgage to "HFC" [Household Finance Company] in the amount of $42,224.00. The Debtor also listed USTrust as a secured creditor with respect to car loans for both 1997 vehicles. On Schedule F–Creditors Holding Unsecured Nonpriority Claims, the Debtor listed 13 creditors including AT & T, with claims totaling $53,589.20. The Debtor failed to indicate the date the claims were incurred. He did not indicate that any of the debts were contingent, unliquidated or disputed. Of the 13 claims listed, all are credit card debts except for two debts owed to Dedham Medical totaling $7,275.20, a debt to Federal Transtel Inc. in the sum of $155.00 and a debt arising from a student loan in the amount of $6,269.00.

On Schedules I and J with respect to Current Income and Expenditures of Individual Debtors, the Debtor listed monthly net income of $790.00 from his employment delivering *The Boston Herald* and pension and retirement income of $1,400.00 per month. The Debtor listed his spouse's net income as $1,705.00. He also disclosed that he had three dependent children, ages 10, 14 and 16. On Schedule J, the Debtor listed total expenses of $4,701.00, including mortgage payments totaling $1,738.00, car payments totaling $688.00, utilities totaling $560.00 and food expenses of $700.00. According to Schedules I and J, the Debtor's expenditures exceed his family's income by $803.00.

On his Statement of Financial Affairs, in response to question 1, with respect to income from employment or operation of a business, the Debtor disclosed that he only received pension income of $17,000.00 in 1996 and pension income and wages totaling $28,836.00 in 1997, the year before the filing. In response to question 2, with respect to income other than from employment or operation of business, the Debtor disclosed that his spouse earned $20,460.00. Though required to disclose his spouse's income for 1996 and 1997, the Debtor did not do so. The Debtor also indicated that he made no payments related to debt counseling and that he had a business bank account with BankBoston, which was still open.

In response to AT & T's Complaint, the Debtor admitted that between April of 1997 and July of 1997, he had a credit balance of $12.71. He admitted that he began using his AT & T card for small purchases beginning on July 27, 1997. He also admitted that he used the card to obtain the following cash advances:

| | |
|---|---|
| 7/26/97 | $1,000 |
| 9/16/97 | $ 300 |
| 10/16/97 | $2,000 |

At the trial, the Debtor testified that he worked for 17 years for a "government entity" until he was terminated from his employment in October of 1995. His employment required that he utilize various aliases. The Debtor testified that he utilized credit cards under names other than his own in the course of his employment. He did not disclose his aliases on his bankruptcy petition, and he did not cite a statute or government regulation that required him to keep his aliases confidential.[1]

---

1. *See* Fed. R. Bankr.P. 9018 which provides in pertinent part the following: On motion or on its own initiative, with or without notice, the court may make any order which justice requires … (3) to protect governmental mat-

Following the loss of his job, the Debtor, because of the limited job market for a person with the skills that he acquired during his years working for a "government entity," took a computer course that continued through the summer of 1996. The Debtor borrowed money to pay his tuition and used his own funds for that purpose. The Debtor testified that the school he attended was "somewhat fly by night," and he was unable to obtain employment in the field of computers. Instead, in January of 1997, he got a job delivering *The Boston Herald.*

The Debtor's financial circumstances were such that he began using his credit cards in November of 1995. In February of 1997, he consolidated his credit card debt, in the approximate amount of $43,000, into a home equity loan secured by a second mortgage on the Dedham property. His purpose was to pay his credit card debt and other debt while obtaining the tax advantage arising from the home mortgage interest deduction. Although the Debtor succeeded in paying a substantial portion of his credit card debt, including paying AT & T the sum of $3,650.00, he continued to use his credit cards. In late 1996 and early 1997 he was using cash advances from some credit cards to make payments on other credit cards. Indeed, he continued this pattern up until the filing of his bankruptcy petition. He stated the following: "I think I was able to make all the payments because if payments came due and I didn't have enough money, I would just use a credit card to pay the other credit cards." [2]

The Debtor incurred significant debt in 1997. In fact, he incurred approximately $40,000 in credit card debt by the time he filed his bankruptcy petition in March of 1998. In addition to mortgaging his home, his wife moved from the marital home for three or four months in the summer of 1997. The Debtor testified that expenses associated with her move totaled $6,000 to $10,000. The Debtor was unable to recall precisely when she moved from the marital home; however, he indicated that he knew "she'd come back eventually." [3]

On May 20, 1997, the Debtor obtained a cash advance in the amount of $5,000.00 on his Compuserv Visa; on June 25, 1997, he charged $2,000.00 for three round trip airline tickets to England; on the same day, he also obtained cash advances totaling $800.00; and, on July 12, 1997, he obtained a $5,000.00 cash advance from Household Finance Company.

On July 3, 1997, the Debtor began working for Customer Driven Delivery Systems, Inc. d/b/a Minute Man Transit. The Debtor worked for Minute Man through November 3, 1997 when his employment ceased. During the four month period he worked at Minute Man, he earned a total of $7,726.15 or approximately $1,900.00 per month. During the second month of his employment, however, the Debtor took two of his three children to England to visit a close friend who sent him $1,000.00 to defray expenses. The Debtor testified that he wanted his sons to meet his best friend who was having heart by-pass surgery.

The Debtor testified that the job at Minute Man was ideal because he had a set delivery route, was guaranteed to make money delivering mail for the Boston school system from its Court Street headquarters to various public schools, and was home in time to meet his children after school. He stated that because he was required to have a van for the job he purchased the 1997 Dodge Caravan, trading in a three or four year old Ford Taurus station wagon. An altercation with a customer resulted in the loss of the school delivery route. The Debtor then quit the job because he could not make enough money without a regular delivery route.

ters that are made confidential by statute or regulation....

**2.** *See* Trial Transcript, p. 82.

**3.** *See* Trial Transcript, p. 31.

The Debtor's spouse returned to the marital residence in the late summer or early fall of 1997. At the time the Debtor obtained cash advances from AT & T, his earnings were comprised of income from his job as a courier for *The Boston Herald* and his pension—approximately $2,400.00 per month. In addition, when he obtained the job with Minute Man in July 1997, his gross monthly income increased to approximately $4,300.00. Although the Debtor's testimony was vague, it appears that his wife had returned to, and was contributing money toward the support of, the family in October of 1997, so that for that month only the Debtor's family income rose to approximately $6,000.00.

In answers to interrogatories, the Debtor estimated his expenses for the 12 months preceding the filing of his Chapter 7 petition as follows:

| | |
|---|---|
| Food | $1,200.00 |
| Clothing | $ 150.00 |
| Utilities | $ 500.00 |
| Auto Exp. | $ 600.00 |
| Misc. | $ 500.00 |

The Debtor did not include his mortgage payments in this list of expenses, which payments equal $1,738.00, for total expenses of $4,688.00—a $13.00 difference from the list of expenditures on Schedule J. The Debtor, however, admitted that he failed to include certain expenses, on Schedule J, including expenses for his daughter's braces, his cell phone and cable TV. Moreover, he admitted that he did not list computer equipment or his cell phone on Schedule B.

With respect to the Debtor's income and expenses, the evidence was uncontroverted that until the Debtor's spouse returned to the marital home, the Debtor's income was insufficient to satisfy the family's expenses. Nevertheless, when he took the first two cash advances from AT & T, he was employed by Minute Man, and, when he took the last cash advance he was employed by Minute Man and his wife had returned to the marital home and her in-come was available for payment of the family's expenditures. Thus, for at least the month of October, 1997, the Debtor's income would have been sufficient to cover monthly expenditures and to make debt service, which AT & T's counsel estimated to be $950.00 per month when he was questioning the Debtor during the trial. Despite the Debtor's recognition of his constrained financial circumstances, he testified that it was his intention to pay his obligation to AT & T.

The Debtor testified that he realized he was having financial troubles "a few months after I took out the second mortgage." [4] In late August and September of 1997, he bounced a number of small checks. On December 22, 1997, he consulted with Consumer Credit Counseling Service and paid the organization a $15.00 fee, which he failed to disclose on his Statement of Financial Affairs. Following his meeting with a credit counselor, he determined to file a bankruptcy petition. He signed his bankruptcy petition on February 14, 1998 and filed the petition approximately five weeks later.

Ronald Lewis, AT & T's bankruptcy specialist, testified that the Debtor's credit history with AT & T did not raise any red flags. According to Lewis, the Debtor opened an account with AT & T in 1992. The Debtor's account was subject to periodic review, which resulted in scores that prior to 1997 were always at "at a very good level." [5] According to Lewis, in early 1997, there was little activity in the account. Lewis then explained how credit card kiting would effect the "scoring" or mathematical assessment of risk associated with the account:

It would maintain it at a good level. Kiting is basically the movement of money from one or more credit cards to other credit cards, and unfortunately, what happens until the bottom falls out, it creates a false illusion on the Credit

---

4. *See* Trial Transcript, pp. 55–56.

5. *See* Trial Transcript, p. 90.

Bureau that the individual has financial stability because everything is being paid as agreed. It completely masks any, any way to determine that there's a problem.... [6]

Lewis testified that the Debtor contacted AT & T on August 31, 1997 to explain that his August payment would be late because he broke his leg on vacation—an event the Debtor admitted did not happen. After that contact, and an indirect contact for authorization for the October 16, 1997 cash advance in the amount of $2,000.00, there was no activity associated with the Debtor's account with AT & T. The Debtor made a last payment on the account in November of 1997. In early January of 1998, AT & T began contacting the Debtor seeking payment.

## III. DISCUSSION

### A. *Applicable Law*

Unlike the court in *La Capitol Fed. Credit Union v. Melancon (In re Melancon)*, 223 B.R. 300, 305 (Bankr.M.D.La. 1998), this Court will not need to read "251 opinions (all published since 1980) concerning dischargeability of credit card debts under 11 U.S.C. § 523(a)(2)(A), to make sure that ...[it] ... can understand the various approaches to what has proven to be a vexing array of subjects (usually within the confines of 'credit card debt' or 'gambling and credit card debt')." Thanks to the well reasoned and persuasive decision of Judge Young in *AT & T Universal Card Services Corp. v. Searle*, 223 B.R. 384 (D.Mass.1998)(citing, *inter alia, Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), and *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996)), this Court has

ample guidance from this jurisdiction as to how § 523(a)(2)(A) applies when debtors use credit cards for cash advances before filing bankruptcy petitions.

In this case, AT & T must establish the following elements by a preponderance of the evidence:

1) that the Debtor made a representation;

2) that the Debtor knew the representation was false at the time he made it;

3) that the Debtor made the representation with actual intent to deceive AT & T;

4) that AT & T justifiably relied on the representations; and

5) that AT & T sustained a loss caused by the false representation.

*Cf. Searle*, 223 B.R. at 388.[7] With respect to the first element, the court in *Searle* determined that use of a credit card for either purchases or a cash advance constitutes a representation because "a representation can be made by words or conduct." *Id.* at 389 (citing *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 & n. 2 (9th Cir.1996); Restatement (Second) of Torts, § 525 cmt. B (1976)).[8] Thus, the debtor in *Searle* and the Debtor in the instant case made representations when they used their AT & T credit cards. However, as the *Searle* court stated, "this is not the end of the inquiry." 223 B.R. at 389.

With respect to the second element, falsity, the United States Court of Appeals for the Ninth Circuit in *Eashai* observed that "[u]nder common law, a false representation can be established by an omission when there is a duty to disclose." 87 F.3d at 1089. In the context of

---

**6.** *See* Trial Transcript, pp. 91–92.

**7.** *See Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), holding that a creditor must prove each element of fraud by a preponderance of the evidence.

**8.** The court in *Searle* adopted an approach to credit card transactions that "conceptualizes

each transaction as a unilateral contract where 'the cardholder promises to repay the debt plus to periodically make partial payments along with accrued interest and the card issuer performs by reimbursing the merchant or advancing the cash.'" 223 B.R. at 389. This Court agrees with that analytical framework.

credit card kiting, the debtor makes a false representation "1) by creating the facade that all of his accounts are in good standing; and 2) by failing to disclose to the creditor his intent not to pay his credit card debt." *Id.* The court determined that in a credit card kiting case, the duty to disclose "is triggered by the debtor's creation of a facade which conceals his fraudulent intentions." *Id.* The court added the following:

> When a debtor, with intent to defraud the creditor, makes minimum payments with cash advances from other credit cards, the debtor has a duty to disclose to the creditor that he no longer intends to pay his credit card debt. If the debtor fails to make this disclosure, then he commits actual fraud.
>
> Clearly, it is not actual fraud simply to make a minimum payment with a cash advance from another credit card. This action on the part of the debtor must also be coupled with a lack of intent to repay the debt.

*Id.* at 1089–90.

■ With respect to the actual intent to deceive element of common law fraud, the district court in *Searle* stated that although the debtor's financial condition can be considered in inferring actual intent to deceive, "actual fraud is to be determined based on the totality of the circumstances." *Id.* at 390 (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 789 (1st Cir. 1997)). In *Eashai*, the United States Court of Appeals for the Ninth Circuit determined that a court may infer the existence of a debtor's intent not to pay with reference to a non-exhaustive list of twelve factors, which were originally articulated by the Bankruptcy Appellate Panel for the Ninth Circuit in *In re Dougherty*, 84 B.R. 653 (9th Cir. BAP 1988). These factors include the following:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*Dougherty*, 84 B.R. at 657 (citing *In re Faulk*, 69 B.R. 743, 757 (Bankr.N.D.Ind. 1986)).

■ The *Searle* court warned that these factors should not be used for the entire actual fraud analysis, 223 B.R. at 390 n. 4, and that "the actual intent element of common law fraud cannot be established by showing that a debtor knew or should have known that he did not have the money available to fulfill his promise." 223 B.R. at 390. In the court's view, "[t]he correct focus ... is whether in good faith he intended to keep his promise." *Id.*

■ The fourth element of common law fraud, justifiable reliance, is established in the credit card context, according to the district court in *Searle*, "so long as the account is not in default and any initial investigations into a creditor report do not raise red flags that would make reliance unjustifiable." 223 B.R. at 391. As the court in *Eashai* recognized, "the true deceit of kiting is that by making minimum payments the debtor almost guarantees

that his account will never raise a red flag." 87 F.3d at 1091.

Few cases address the issues of causation and damages. In *In re Melancon,* the court examined § 546 of the Restatement (Second) of Torts, which provides:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter represented, if his reliance is a substantial factor in determining the course of conduct that results in his loss.

223 B.R. at 325 (quoting Restatement (Second) of Torts § 546 (1976)). The *Melancon* court, while finding this section ambiguous, concluded that "[i]f the misrepresentation plays a substantial role in the issuer's decision making process and the result of that process is a course of action (or inaction) that results in a loss, then the misrepresentation is a cause-in-fact of the loss...." 223 B.R. at 326.

 Because the credit card holder represents his intent to repay when he obtains a cash advance, he induces action on the part of the credit card issuer and, thus, if the card holder makes a false representation, either overt or by omission, it is a substantial factor in the issuer's decision to provide cash. Similarly, proof of damage is readily established when the debtor fails to repay the cash advance or other credit card debt.

### B. *Analysis*

 In the instant case, AT & T has established all the elements of common law fraud except those related to the Debtor's knowledge of the falsity of his representation and his actual intent to deceive AT & T. AT & T established that the Debtor does not fit squarely within the paradigm of "the honest but unfortunate debtor." The Debtor's Schedules and Statement of Financial Affairs are replete with errors and omissions. The Debtor failed to list

his personal computer on Schedule B and he failed to accurately list all his expenditures on Schedule J. Additionally, he lied to AT & T about breaking his leg to obtain an extension of time within which to make the August payment on his credit card. Although AT & T successfully challenged the Debtor's veracity at several points during the trial, the Debtor's untruths were not substantive and material to AT & T's § 523(a)(2)(A) complaint. AT & T was required to establish that the Debtor's representations with respect to the use of his credit card were false when made and were made with the intention of deceiving it. The Court finds that AT & T failed to sustain its burden that the Debtor actually intended to deceive it when he used his AT & T credit card.

The Debtor obtained cash advances in July, September and October of 1997. He consulted a credit counseling agency over two months after obtaining his last cash advance, did not sign his bankruptcy petition until four months after his last cash advance and did not file for bankruptcy for another month. He did not consult his bankruptcy attorney until after the charges were made. He took only three cash advances and did not use the card for an excessive number of purchases, and AT & T did not establish that he incurred multiple charges on its account on the same day. At the time the Debtor obtained the cash advances, his financial condition was not good, but it was much better than it had been because he had obtained employment with Minute Man. Although the total amount outstanding on the Debtor's AT & T card exceeded the Debtor's credit limit at the time he filed his bankruptcy petition this was in part due to finance charges as opposed to substantial charges over his credit limit. AT & T did not establish that the Debtor was financially sophisticated, although he was certainly not ignorant about tax and financial matters.[9] AT & T also did not estab-

---

9. In this regard, the Debtor's decision to consolidate credit card debt and obtain home

equity loan to pay it is instructive. The Debtor could possibly have filed a Chapter 7 case

lish that there was a sudden change in the Debtor's buying habits. It did establish that the Debtor took a vacation to England with his two sons, but it did not challenge the Debtor's testimony that he wanted his children to meet his best friend who was having heart surgery and that his friend helped to defray the expenses of the trip.

The Court's evaluation of the *Dougherty* factors compels the conclusion that AT & T failed to sustain its burden that the Debtor intended to defraud it at the time he obtained cash advances. A comparison of the facts in *Searle* with those present in *Eashai* supports this conclusion. In *Eashai*, the Debtor engaged in a sophisticated credit card kiting scheme in which he used cash advances to make his minimum monthly payments which added up to $3,000 per month; his monthly income exceeded his expenses by over $2,000; he had no prospects of employment at the time he incurred credit card charges; he was financially sophisticated; his spending habits changed dramatically and he used cash advances to gamble and to make speculative investments, running up over $140,000 in unsecured credit card debt. In contrast, in *Searle*, the debtor used cash advances from various credit cards to pay rent, legal fees, travel for child visitation and necessities. Although he took nearly $30,000 in cash advances, he did this to protect his credit rating and he obtained a good job prior to taking cash advances with his AT & T card. He did not use the cash advances to pay other credit card debt, although he failed to make any payments after obtaining the cash advances.

The Court finds that the fact pattern in *Searle* is more analogous to the fact pattern in the instant case than the fact pattern in *Eashai*. Although the Debtor admitted that he engaged in credit card kiting, he testified that he used the cash to pay bills and to support his family. The Debtor's financial circumstances went into a tailspin after he lost his job of 17 years. The Debtor made a good faith effort to obtain skills in the computer field, but ended up as a courier because such work enabled him to be at home when his children returned home from school. The Debtor testified that he intended to repay AT & T when he took cash advances. In view of the fact that he was earning more money when he took the cash advances than he had in the previous year, and in view of the uncontroverted testimony that he always expected his spouse to return home and support the family, this Court cannot find that the Debtor made false representations with actual intent to deceive AT & T at the time he took cash advances and otherwise used his credit card for various purchases. Although the Debtor's honesty and integrity was successfully challenged by AT & T, this Court cannot find that the discrepancies in his schedules fatally undermined his credibility with respect to circumstances surrounding his transactions with AT & T. Accordingly, AT & T has failed in its burden of proof on all elements of common law fraud.

## IV. CONCLUSION

In view of the foregoing, the Court hereby enters judgment in favor of the Debtor and against AT & T.

---

in February of 1997 and discharged his credit card debt. Had he claimed the state exemptions, he could have preserved the equity in his home and obtained a fresh start. He decided instead to pay his unsecured debt with the equity in his home. He recognized the tax advantage, but he further encumbered his only valuable asset.