In re Joan ASHLAND, Debtor.

MBNA America Bank, N.A., Plaintiff,

v.

Joan Ashland, Defendant.

Bankruptcy No. 02–11782–WCH.
Adversary No. 02–1189.

United States Bankruptcy Court,
D. Massachusetts.

March 18, 2004.

Warren E. Agin, Swiggart & Agin LLC, Boston, MA, for Plaintiff.

Shaun M. Ellis, Sandwich, MA, for Debtor/Defendant.

## DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

### Introduction

MBNA American Bank, N.A. ("Plaintiff") brought this adversary proceeding contending that certain debts owed to it by Joan Ashland ("Defendant") were nondischargeable. After trial I took the matter under advisement. I now find for the Plaintiff to the extent set forth in this decision.

### Findings of Fact

Defendant and her then husband, John Ashland, owned their home in West Yarmouth, Massachusetts in which they lived with their three children, aged 9, 11, and 14. There were domestic difficulties and her husband left the marital home about November, 2001. He failed to make regular child support payments until she subsequently obtain a court order. Also exacerbating the situation was the fact that Defendant, a "personal care assistant", could no longer take overnight assignments as her husband was not home with the children, which resulted in reduced income.

One item that John left behind was a "Citi Drivers Edge Gold Card" balance. The "Citi card" was in his name, but Defendant testified that "it was both of our cards," *Transcript,* p. 32, that she had made the payments on that card and that she had never been late. In February, 2002, the creditor advised her that it intended to increase the rate on that card from 8.9% to 25%, based upon other aspects of her (or *his* or *their*-the record is not more precise) credit history, so that the payment which she was accustomed to make would result in a monthly principal reduction of only $2.00.[1]

At some time prior to January 1, 2002, Defendant had obtained a credit card, nominally from AAA but actually from the Plaintiff, in her own name (the "AAA card"). It appears from the record that each monthly statement from the Plaintiff was accompanied by three checks, called "convenience checks" by the litigants. The three statements introduced at trial all contain the following under the caption "IMPORTANT NEWS":

> How to use the three enclosed checks? Home Improvements, Vacations, Bill Consolidations ... The List is Endless!

Plaintiff's enthusiasm for the blank checks is somewhat explained by the fact that each use generated a "check transaction fee" of $30 or $40 as well, of course, as interest on sums remaining unpaid. On Defendant's side, balance transfers and checks carried an interest rate of only 8.9% as against 14.99% on purchases.

Defendant testified that, dismayed by the now high interest rate on her formerly low rate card, she took advantage of this offer and drew several checks on the account. Her testimony was that she was always looking for a lower rate and would transfer balances from one credit card to another in order to obtain it.

The first check Defendant drew paid off the Citi card balance. Meanwhile, she was considering other avenues to address her financial problems. At about this time, as shown on the chart below, Defendant consulted bankruptcy counsel. She drew a second check, deposited it to her bank account, and used the funds for mortgage payments,[2] a dentist bill, and a retainer to her bankruptcy counsel. In response to a leading question from her counsel, she testified that she did not "necessarily" intend to pay counsel from the second check. Her testimony was that at all times up to mid-March she fully intended to repay Plaintiff. She further testified that, when she signed the petition, she and Mr. Ellis agreed that it would not be filed then— "we would just wait until I was sure of what I wanted to do." *Transcript,* p. 28. That authority was given on the 11th or 12th of March. *Id.*

A time line will be useful in analyzing the various events which occurred during the relevant period:

| Date or Time Period | Event |
| --- | --- |
| Prior to 11/2001 | Husband leaves. |

1. The one Citi card statement introduced into evidence (Defendant stated that she did not keep earlier statements) does not fully support this version of the facts, but Plaintiff made no effort to question the testimony.

2. There is some confusion about the date on which the first mortgage payment was made, and it is possible that not all of the mortgage payments evidenced by money order receipts in the record were proceeds of the second check drawn on the MBNA account. Fortunately, that does not make a difference for the result of this proceeding.

| | |
|---|---|
| Prior to 1/1/2002 | Defendant obtains AAA credit card |
| 1/12/2001 | **60 days prior to filing of petition** |
| 2/?/2002 | Defendant advised of rate increase on Citi card |
| 2/12/2002 | Defendant calls Atty Ellis' office; makes appointment for 2/21/2002; told to file homestead |
| 2/14/2002 | Check drawn ($7,486.82), used to pay off Citi card |
| 2/20/2002 | Second check drawn ($2,890.00) and deposited; declaration of homestead filed |
| 2/21/2002 | First meeting with Atty Ellis; paid $50 |
| 2/25/2002 | Proceeds of second check withdrawn from bank; Chapter 7 petition signed |
| 3/1/2002 | Money order for $500 payable to Atty Ellis |
| 3/11 or 12/2003 | Ellis authorized to file petition. |
| 3/13/2002 | Chapter 7 petition filed. |

### Positions of the Parties

Plaintiff argues that the credit which Defendant obtained through the two convenience checks[3] is presumed to be nondischargeable under 11 U.S.C. § 523(a)(2)(C) either as purchases of luxury goods or services or cash advances that are extensions of consumer credit under an open end credit plan, supporting a finding of nondischargeability under § 523(a)(2)(A). Defendant contends that the check advances were not written for luxury goods nor with an intent not to repay, and that, even if the presumption is applicable, she has overcome the presumption.

### Discussion

The portions of the Bankruptcy Code sought to be applied here are as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual from any debt-

...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

...; or

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,150[4] for "luxury goods or services" incurred by an individual debtor on or˜ within 60 days before the order for relief under this title, or cash advances aggregating more than $1,150 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act.[5]

11 U.S.C. § 523(a)(2).

Plaintiff made no attempt to demonstrate that the amounts resulting from the

---

**3.** Plaintiff is not contesting the dischargeability of other sums due on the credit card.

**4.** Increased to $1,225 effective April 1, 2004. *See* 11 U.S.C. § 104(b).

**5.** "The term 'open end credit plan' means a

two checks for used for the acquisition of luxury goods, and I consider any claim to that effect waived or not proven. The question of whether the other provisions of the presumption apply requires a bifurcation of the discussion of the two checks.

## A. The first check and the § 523(a)(2)(C) presumption

■ It is undisputed that Defendant used the check drawn on February 14, 2002 solely to pay off the balance on the preexisting Citi card debt. There is no dispute but that the advance represented by this check is an extension of credit under an open end credit plan, in any amount sufficient to invoke the statute, and within the 60 day period. There are, however, some difference of opinion in the cases as to whether such payments are "cash advances" within the reach of the § 523(a)(2)(C) presumption.

Judge Haines reviewed the issue at length in *Chase Manhattan Bank v. Poor (In re Poor)*, 219 B.R. 332 (Bankr.D.Me. 1998). That case involved a direct transfer, where the cash to pay off the balance did not pass through the debtor's hands. Judge Haines held that

> It would pervert the statute's purpose to interpret "cash advance" so expansively as to bring Poor's balance transfer within its scope. The defining characteristics of the transaction witness this conclusion.
>
> Poor could not receive cash to spend as she pleased through completing the

plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance. A credit plan

balance transfer boxes on the Chase application.

*Id.* at 337.

I fully agree with Judge Haines' interpretation of the statute and direct readers to that opinion for the extensive case authority which he cited and which I need not repeat here. I cannot disagree with his position that "to allow the Bank to prevail in this situation would result in converting dischargeable debts into nondischargeable debts and would amount to this court condoning commercial entrapment." *Id.* at 337 n. 9.

This case, of course, has an intermediate step. The transfer of the Citi card balance was by means of a check drawn on Plaintiff's account by Defendant. In dicta, Judge Haines seems to queries whether this distinguishes the two cases; that "the use of an access check written by the debtor directly to a creditor to pay an existing credit card balance is not a far cry from the transaction before me today." *Id.* at 338 n. 10. I hold that the distinction is one without a difference, and that the § 523(a)(2)(C) presumption does not apply to the first check. This does not resolve the issue completely, however, and it will still be necessary to examine the requirements of § 523(a)(2)(A), absent the presumption. I will return to that issue after dealing with the second check.

## B. The second check and the § 523(a)(2)(C) presumption

■ The later and smaller check was used to make mortgage payments, pay a dentist's bill, and provide a retainer for bankruptcy counsel. Defendant asserts

which is an open end credit plan within the meaning of the preceding sentence is an open end credit plan even if credit information is verified from time to time." 15 U.S.C. § 1602(i).

that she fully intended to repay that amount at the time that she drew the check. That, however, does not rebut the presumption which contains no intent element. I conclude that Defendant has not overcome the presumption as to that amount and hold that the $2,890.00 represented by the second check is nondischargeable.

## C. The first check without a presumption

Having held that the presumption of § 523(a)(2)(C) is inapplicable to the first check, I must deal with the evidence as it relates to § 523(a)(2)(A), presumption-less.

■ The cases in this district generally analyze § 523(a)(2)(A) as set forth in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) and *Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir.1997), and as applied to cases involving credit cards in *AT & T Universal Card Services Corp. v. Searle*, 223 B.R. 384 (D.Mass.1998):

> Under the common law, a debtor is liable for actual fraud or fraudulent representation if:
>
> 1) He made a representation;
>
> 2) At the time of the representation, he knew it to be false;
>
> 3) He made the representation with actual intent to deceive the creditor;
>
> 4) The creditor justifiably relief on the representation and the reliance was reasonably founded; and
>
> 5) The creditor sustained a loss or damage caused by this false representation.

*Id.* at 387. *See AT & T Universal Card Services Corp. v. Dietzel*, 245 B.R. 747, 752 (Bankr.D.Mass.2000).

■ Plaintiff must establish each of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### 1. False representation

After the initial credit card agreement, there is no face-to-face dealing between the card issuer and the card holder. This leads to confusion when one tries to apply the false representation test. Instead of the various other tests which have been applied, Judge Young utilized, and I adopt the approach that "each transaction [is] a unilateral contract where the cardholder promises to repay the debt plus to periodically make partial payments along with accrued interest and the card issuer performs by reimbursing the merchant who has accepted the credit card in payment or advancing the cash." *Searle* at 389 (internal quote and citation omitted).

Among the facts stipulated by the parties here is the following:

> Each and every time Joan Ashland used the credit line available through the Account, she represented that she had the ability and intent to repay the credit which was advanced.

Joint Pretrial Statement, ¶ 2h.

The first requirement is satisfied.

### 2. The representation was false when made.

Defendant testified specifically that, when she used the convenience checks, she intended to repay Plaintiff. As against this we have the fact that she made an appointment with bankruptcy counsel two days before drawing the payoff check. The circumstances are cloudy at best. Countering the arrangements to meet counsel we have her testimony that, even when the petition was prepared and signed, she had not finally determined to file. This colloquy ensured on direct:

> Q. Okay. At the time that you came into the—you spoke to Ann Marie [Ellis' employee] on the phone for that initial

consult and you had not made the decision to file bankruptcy—

A. No.

Q. had you made the decision to file bankruptcy when you paid the $50 on the 21st?

A. No.

Q. Had you made the decision to file bankruptcy on the 25th?

A. No.

Q. Had you made the decision on the 1st when you paid the $500?

A. No, because I told him I would wait just a little bit more, you know, just—

Q. And sometime during the period after that, before the 12th is when you made your decision.

A. Right.

Q. Okay. At the time your wrote the convenience check taking the $2,890 and putting it in your account did you intend to repay MBNA on that date?

A. Pay them?

Q. Not in full—did you intend to repay that debt?

A. Oh, yeah.

Q. Okay. And you intended—

A. That's why I paid—I wanted to pay the Citi—the—the other credit card, pay that one off, and just keep paying. It was—

Q. What changed between the time you made these two checks, one on the 20th and the one on the 25th, and March 12th that made you realize that you—that you were not able to make these payments and would file bankruptcy?

Q. There was just no income. I couldn't do my work. I couldn't do my overnights anymore. I have three small kids. I couldn't leave them at home. I couldn't pay my mortgage payments.

*Transcript,* p. 29–30.

I find this testimony less than credible. All of the critical factors in the last answer existed from the time that Defendant's husband left in November; they did not spring into being in March. I find that Defendant was planning bankruptcy at the time that she used the convenience checks.

It does seem unreasonable for Defendant to have converted a (most likely) dischargeable—if she was liable on it—liability on the Citi card to a substitute obligation well within the presumption period. While I will not ascribe to Defendant the Machiavellian motives Plaintiff's counsel suggested in closing argument, the chain of events could well have been triggered by a misapprehension of the workings of bankruptcy. She had talked only to an employee of her bankruptcy counsel on the telephone and the checks were drawn prior to her first meeting with him. Whatever the motivation, I conclude that Plaintiff has satisfied its burden in this regard.

3. *The representation was made with intent to deceive.*

Given the implied representation under the *Searle* factors, and my findings in the previous section, I hold that the Plaintiff has met its burden in this regard.

4. *The creditor justifiably relied.*

This was stipulated. *Joint Pretrial Statement,* ¶ 2h.

5. *The creditor sustained a loss caused by the false representation.*

This is self-evident.

### Conclusion

■ I hold that the indebtedness of Defendant to Plaintiff represented by the two

checks is nondischargeable, the former check because of the presumption and the latter without its benefit.

■ Plaintiff seeks an award of attorneys' fees in connection with this adversary proceeding but I consider that to be inappropriate. I have previously ruled that I cannot issue a money judgment in an adversary proceeding seeking a ruling of nondischargeability. *American Express Centurion Bank v. Losanno (In re Losanno)*, 291 B.R. 1 (Bankr.D.Mass.2003). The award of fees would be a variation on that prohibited theme. Plaintiff can seek to collect those fees, if appropriate, when it exercises its state court remedies.

A separate judgment will enter.