Revised May 15, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No.  98-60693

_____

In the matter of: CONSTANCE P. MERCER,

Debtor.

AT&T UNIVERSAL CARD SERVICES,

Appellant,

VERSUS

CONSTANCE P. MERCER,

Appellee.

_____

Appeal from the United States District Court
For the Southern District of Mississippi
April 26, 2000

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

DUHÉ, Circuit Judge:

    AT&T Universal Card Services ("AT&T") appeals the bankruptcy court's determination that Constance P. Mercer's ("Mercer") credit card debt was dischargeable under 11 U.S.C. § 523(a)(2)(A).  We affirm.

## I. FACTS AND PROCEEDINGS

    We summarize only the facts relevant to our decision which include AT&T's pre-approval process, and Mercer's response to

AT&T's pre-approved credit card application. We do not discuss the events after Mercer received the card or her general financial standing. On November 10, 1995, AT&T opened Mercer's credit card account pursuant to a pre-approved credit application mailed to Mercer and signed by her. Although Mercer's credit limit on this AT&T account was $3,000, within a month she had exceeded this limit by $186.82 through charges and cash advances at automated teller machines ("ATM").

AT&T relies on third party credit agencies to screen potential applicants. A credit bureau makes an initial screening. These names are then matched against AT&T's own internal risk and scoring models to determine creditworthiness. The names that make this cut are then returned to the credit bureau for a second screening to review any change in credit standing or credit history. These credit bureaus place a risk or FICO score on each name to determine the probability of an account becoming delinquent. AT&T requires a minimum FICO score of 680 before sending out a solicitation offer to a prospective customer. The credit bureau assigned Mercer a FICO score of 735. Under the Fair Credit Reporting Act, AT&T must make a bonafide offer of credit to anyone who passed the screening process.

In September 1995, AT&T mailed Mercer and offer to open a credit card account. Mercer completed, signed, and returned her acceptance. Mercer provided AT&T an income figure of $24,500, a social security number, a date of birth, a home and business phone

number, and a maiden name. AT&T then conducted a further review of Mercer's ability to service a credit line of $3,000. AT&T then sent Mercer on November 10, 1995 a card and a cardmember agreement.[1] Mercer then used the account to obtain fourteen cash advances from ATMs, some in casinos. By early December, she had exceeded her credit limit, and AT&T barred her from further use of the account. In all, Mercer carried seven credit cards between March and December 1995.

Mercer filed a petition for bankruptcy relief under Chapter Seven of the Bankruptcy Code. AT&T challenged the dischargeability of the debt under Section 523(a)(2)(A). The bankruptcy court concluded that the debt was dischargeable. The court determined that Mercer did not make any representations to AT&T regarding her creditworthiness. Because she had made no representations, AT&T could not meet the reliance requirement to challenge dischargeability under Section 523(a)(2)(A). The district court affirmed the bankruptcy court's decision. We affirm.

## II. STANDARD OF REVIEW

---

[1] The agreement became effective when Mercer used the card or the account. The agreement states that a card holder is "responsible for all amounts owned on [the card holder's] [a]ccount . . . and [the card holder] agree[s] to pay such amounts according to the terms of the [a]greement." Regarding purchases and cash advances, the agreement says a card holder may use the card to "obtain a loan from [the card holder's] [a]ccount, by presenting it to any institution that accepts the [c]ard for that purpose, or to make a withdrawal of cash at an automated teller machine (ATM). Both of these transactions are treated as 'Cash Advance' on [the card holder's] [a]ccount." AT&T also may limit these cash advances.

3

We review the bankruptcy court's factual findings for clear error and its conclusions of law de novo. Foster Mortgage Corp. v. United Companies Financial Corp., 68 F.3d 914, 917 (5th Cir. 1995).

### III. DISCUSSION

Section 523(a)(2)(A) of the Bankruptcy Code provides:

> A discharge under section 727 . . . of this title does not discharge an individual from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretense, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

A creditor must prove its claim of nondischargeability by a preponderance of the evidence. In order for a debtor's representation to be a false representation or pretense, a creditor must show that the debtor (1) made a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the creditor; (4) who thereby suffered a loss. RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292-93 (5th Cir. 1995). The creditor must show that it actually and justifiably relied on the debtor's representations. Field v. Mans, 516 U.S. 59, 69-70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

The bankruptcy court concluded that AT&T did not actually rely on representations by Mercer because Mercer made no representations. AT&T pre-approved the card based solely on its own screening process. The court said, "Mercer never solicited the credit card from AT&T; never knew of nor gave her permission for the investigations; and was never asked about her debts, gambling

4

losses, financial condition, or other credit cards being used by her or the balances thereon. . . . AT&T <u>solely</u> <u>relied</u> on its own agents and investigative processes to makes its decision."

The bankruptcy court's determination is correct. Because AT&T provided Mercer a pre-approved credit card with a pre-approved credit limit, Mercer could not make any false representations AT&T could rely on. <u>Sears, Roebuck and Co. v. Hernandez</u>, 208 B.R. 872, 877 (Bankr. N.D. Tex. 1997) ("Passively extending credit in itself is not reliance."); <u>Household Credit Services, Inc. v. Walters</u>, 208 B.R. 651, 654 (Bankr. W.D. La. 1997) (finding no evidence of reliance where creditor issued pre-approved credit card).[2] The information Mercer returned to AT&T with her acceptance does not amount to any sort of false representation regarding her intent to pay. AT&T correctly points out that it has no duty to investigate

---

[2] Several other courts have determined that a creditor cannot show actual and justifiable reliance when it issued a pre-approved credit card. <u>AT&T Universal Card Services v. Ellingsworth</u>, 212 B.R. 326, 338 (Bankr. W.D. Mo. 1997) ("[A] creditor cannot justifiably rely on any representation, or the absence thereof, made by a card holder if the card was pre-approved, and no direct financial information was obtained by the issuer."); <u>AT&T Universal Card Services Corp. v. Arroyo</u>, 205 B.R. 984, 986 (Bankr. S.D. Fla. 1997) (concluding that creditor failed to meet burden of proof under Section 523(a)(2)(A) because of failure to investigate creditworthiness of debtor prior to pre-approval); <u>AT&T Universal Card Services Corp. v. Akdogan</u>, 204 B.R. 90, 97 (Bankr. E.D.N.Y. 1997) (determining that creditor must at least conduct a credit check in order to show justifiable reliance); <u>AT&T Credit Card Services and FCC National Bank v. Alvi</u>, 191 B.R. 724, 731 (Bankr. N.D. Ill. 1996) ("A creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation.")

the debtor to show justifiable reliance.  See La. Capital Fed. Credit Union v. Melancon, 223 B.R. 300, 331 (Bankr. M. D. La. 1998) citing American Express Travel Related Services Co. Inc. v. Hashimi, 104 F.3d 1122 (9th Cir. 1996).  However, justifiable reliance pre-supposes that the debtor has made a representation. Here Mercer made no representation.  Therefore, AT&T neither could have actually nor justifiably relied.

AT&T also contends that the bankruptcy court erroneously concluded that because AT&T did not rely on the debtor's representations when the card was issued AT&T could not subsequently rely on implied representations made by the debtor with her use of the card.  AT&T argues that we should adopt the implied representation theory.  Under this theory, the card holder makes a representation that he or she intends to pay each time he or she receives money at an ATM.  The money received amounts to a loan from the bank.  Melancon, 223 B.R. at 311 ("When the card holder inserts the card into the ATM, he is, in one step, asking for a loan and promising to repay it if it is obtained.")

This Circuit has not adopted the implied representation theory, and we decline to do so in the pre-approved credit card context.  First, although the debtor has borrowed money, the primary decision to extend credit was made before the implied representation.  AT&T assumes the risk of any future lending by the debtor.  Second, adoption of this theory would improperly shift the burden of proof in Section 523(a)(2)(A) actions.  See Hernandez,

6

208 B.R. at 880. The debtor would essentially become the guarantor of his or her financial condition, and the theory would offend "the balance of bankruptcy policy struck by Section 523." Chevy Chase Bank v. Briese, 196 B.R. 440, 448 (Bankr. W.D. Wis. 1996) citing Matter of Ford, 186 B.R. 312, 317 (Bankr. N.D. Ga. 1995). We conclude that we should apply a rule that favors the debtor instead of the creditor at least in the pre-approved credit card context, and we decline to apply the implied representation theory.[3]

Finally, the dissent argues that this holding will only encourage "irresponsible and dishonest debtors to go on unrestrained spending sprees" leading to more consumer bankruptcies and greater costs passed on to all credit card users through higher interest rates. The credit card issuers' irresponsible lending practices are another part of this problem. In this case, AT&T issued Mercer a pre-approved credit card based on a minimal third-party credit check. If AT&T had merely asked Mercer for information regarding her credit card usage, AT&T may have been more prudent in its lending practices, but AT&T did not.

This holding properly places a greater responsibility on credit card issuers for their lending practices, which have become increasingly irresponsible. According to a recent newspaper article, credit card issuers are "paying more attention to high-risk groups, such as households with proven debt problems and

---

[3] Melancon dealt with credit card debt that was not the result of pre-approval by the creditor.

younger consumers.  Some issuers are even targeting high-school students."  Scott Kilman, <u>Credit-Card Come-Ons Met by Disinterest</u>, Wall St. J., March 23, 2000, at A2.  This holding properly favors the debtor instead of the creditor, and will hopefully encourage more responsible lending practices by credit card issuers.

For these reasons, we affirm.

AFFIRMED.

DENNIS, Circuit Judge, specially concurring:

I agree with Judge Duhe's conclusion that AT&T failed to prove that Mercer's debt is not dischargeable under section 523(a)(2). I also agree with much of his opinion. I concur specially because, in my opinion: (1) when a debtor uses a credit card, he or she impliedly promises to repay the loan; but (2) a credit card company cannot justifiably rely upon every card user's representation simply because the card was used; therefore, (3) a creditor who issues credit cards without a reasonably adequate assessment of each debtor's credit history and present financial condition cannot claim that mere use of any such card constitutes a justifiably relied upon representation to pay; however, (4) such a creditor may, through a period of good experience with the debtor, acquire a basis for believing that the debtor's mere use of the card is such a representation upon which the creditor may justifiably rely.

To demonstrate that a debt is not dischargeable as fraudulent under section 523(a)(2), a creditor must prove by a preponderance of the evidence that (1) the debtor made false representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor actually and justifiably relied on such representations; and (5) the representations proximately caused the debtor to obtain money

and the creditor to sustain losses. *See RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995) (as modified by *Field v. Mans*, 516 U.S. 56, 69 (1995)).

I agree with the Ninth Circuit that "[e]ach time a 'card holder uses his credit card, he makes a representation that he intends to repay the debt.'" *American Express Travel Related Services Company, Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1126 (9th Cir. 1997) (quoting *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996)). Thus, Mercer clearly made representations of her intent to repay when she used the credit card to obtain cash advances. However, to prevail under section 523(a)(2), a creditor must prove all of the essential elements of fraud. *See RecoverEdge*, 44 F.3d at 1292. Proof of an implied representation of the debtor's intent to repay by the use of the card does not satisfy the creditor's burden to establish any of the other elements of fraud, including the debtor's knowledge of falsity and intent to deceive, the creditor's actual and justifiable reliance upon the representation, and the causal link between the representation and the debtor's obtainment of money.

Because the bankruptcy court held that Mercer did not make any implied representations, it did not address the falsity and intent elements. Regardless of whether the implied representations were knowingly false and made with the intent to

deceive, however, AT&T failed to prove that Mercer's debt was excepted from discharge under section 523(a)(2) because, under the undisputed facts AT&T did not justifiably rely on the representations to repay loans implied by Mercer's use of the credit card.  The Supreme Court has held that, for a debt to qualify for the exception to discharge under section 523(a)(2), the creditor must prove that he actually and justifiably relied on knowingly false representations made by the debtor for the purpose of deception.  *See Field*, 516 U.S. at 70.  The requirement that reliance be justifiable is to insure that such reliance is actual.  As the Court stated:

> As for the reasonableness of reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact.  Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naive.  The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance.

*Field*, 516 U.S. at 76.  Professors Keeton and Prosser (cited with approval by the Court in *Field*) discuss the justifiable reliance factor similarly, stating:

> The other side of the shield is that one who has special knowledge, experience and competence may not be permitted to rely on statements for which the ordinary man might recover, and that one who has acquired expert knowledge concerning the matter dealt with may be required to form his own judgment, rather than take the word of the defendant.

W. PAGE KEETON ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 108, at

11

751 (5th ed. 1984).  Furthermore, as Justice Ginsburg, concurring, pointed out, the creditor must prove not only that he "justifiably relied", but also that the money was "obtained by" (i.e., the loan of money was caused by) the alleged misrepresentation.  *Field*, 516 U.S. at 78 (Ginsburg, J., concurring).

Justifiable reliance is something more than actual reliance, but less than reasonable reliance, depending on the creditor. With respect to the subjective element of justifiable reliance, the Court stated that "the matter seems to turn upon a plaintiff's own capacity and the knowledge which he has or which may fairly be charged against him from the facts within his observation in the light of his individual case."  *Field*, 516 U.S. at 72 (citing W. PROSSER, LAW OF TORTS § 108, at 717 (4th ed. 1971)).  In addition, the Court held that "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."  *Id.* at 70 (citing RESTATEMENT (SECOND) OF TORTS § 545A, comment *b* (1976)).

It is undisputed that, in the present case, AT&T received no direct financial information from Mercer.  Rather, AT&T based its decision to issue the pre-approved credit card on a screening formula based on a report of a history of Mercer's ability to

make at least minimum monthly payments on her other credit cards in the past.  In doing so, AT&T relied "upon its own judgment and experience as it issue[d] the card and as it determine[d] whether to honor any specific charge made upon the card, and not upon any representation made by the cardholder."  *In re Herrig*, 217 B.R. 891, 899 (Bankr. N.D. Okl. 1998).  Thus, in this respect I agree with Judge Duhe and the Bankruptcy Court in *In re Ellingsworth* that credit card companies assume the risk of issuing pre-approved credit cards on such meager information and thus "cannot justifiably rely on any representation, or absence thereof, made by a card-holder if the card was pre-approved, and no direct financial information was obtained by the issuer."  212 B.R. 326, 339 (Bankr. W.D. Mo. 1997).

However, I do not think that the creditor's initial assumption of risk necessarily prevents the issuer of a pre-approved credit card from ever justifiably relying on any future representations made by the holder.  Rather, I believe that justification may develop over time -- for example, as the holder develops a credit history of payments with the specific issuer.  This view is based upon section 523(a)(2) as it has been interpreted by the Supreme Court in *Field* and applied by numerous other courts that have addressed this issue.  *See, e.g., In re Herrig*, 217 B.R. at 900; *In re Carrier*, 181 B.R. 742, 749 (Bankr. S.D.N.Y. 1995); *see also In re Foley*, 156 B.R. 645 (Bankr. D.N.D.

1993) (holding that a series of payments established reasonable reliance); *cf. In re Hashemi*, 104 F.3d at 1126 (holding that a pre-approved credit card holder made implied representations with each use of the card and that because "appellant himself testified that he had repaid American Express balances of up to $60,000 'numerous times' before . . . American Express therefore had no reason to question the good faith of appellant's promise to repay.").[4]

Applying the elements of section 523(a)(2) to the undisputed facts in the present case, I conclude that prior to the uninvited issuance of the credit card to Mercer, AT&T did not make a reasonably adequate assessment of her present financial condition so as to warrant considering her mere use of the card as a

---

[4]The partial quotation from *In re Anastas*, 94 F.3d at 1286, that Judge Barksdale borrows as his standard is not a complete or comprehensive statement of the Ninth Circuit's jurisprudence on justifiable reliance. The quote in *In re Anastas* was dicta as that court ruled solely on fraudulent intent and not on justifiable reliance. *See id*. at 1287. Further, the court in *In re Anastas* cited *In re Eashai* for this test, a case in which the cardholder had established a history of payments with the specific creditor at issue. *See Citibank (South Dakota) N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1090-92 (9th Cir. 1996)). If Mercer had, as in *In re Eashai*, developed a credit history with AT&T without any red-flags, AT&T's reliance may arguably have been justifiable. *See also In re Hashemi*, 104 F.3d at 1126; *AT&T Universal Card Services Corp. v. Burdge (In re Burdge)*, 198 B.R. 773, 778 (B.A.P. 9th Cir. 1996) ("In the past, Burdge had a good payment record [with AT&T], which demonstrated a responsible use of the charge card."); *F.C.C. National Bank v. Cacciatore (In re Cacciatore)*, 209 B.R. 609 (Bankr. E.D.N.Y. 1997); *AT&T Universal Card Services Corp. v. Feld (In re Feld)*, 203 B.R. 360 (Bankr. E.D. Pa. 1996).

representation upon which AT&T could justifiably rely.[5]  AT&T was

not primarily caused to authorize loans by Mercer's use of the

card; on the contrary, AT&T relied primarily on a prediction of a

"risk score" based on impersonal credit bureau credit history

information--Mercer's "risk score" was 735 on a scale of 900, not

far above AT&T's minimum score of 680.  There was nothing in

AT&T's brief experience with Mercer as a cardholder that would

justify its belief that it had acquired a more substantial basis

for its reliance upon her representations than it started out

with, to wit: (1) fourteen of Mercer's transactions were cash

loans, several of which were made within a casino;[6] (2) Mercer

borrowed the maximum cash advance amount within thirty one days

after receipt of the card; (3) Mercer had developed no history of

payment or good standing with the issuer (Mercer had only made

one payment of $25); (4) nineteen days after issuance, the

issuer's own computer had red-flagged the use of Mercer's credit

---

[5]Judge Barksdale correctly points out that AT&T did have a credit bureau screening process designed to assess her "risk score" according to indices of her credit history, but it is undisputed that AT&T did not have any information as to Mercer's financial condition or ability to pay at the time it issued the card, i.e., to what extent her current debt levels exceeded her net worth and future income.

[6]At trial, AT&T's representative conceded that AT&T considers the location of charges and cash withdrawals in determining whether such charges should be a source of concern.  For example, he conceded that charges made at casinos (presumably for gambling) would raise more of a concern than charges for food, shelter, or clothing and that charges made in a high-crime area could possibly be a cause for concern.

card for excessive transactions. "[T]aking [the] qualities and characteristics of the particular plaintiff, and the circumstances of the particular case" as a whole, AT&T as a sophisticated financial actor did not satisfy its burden to prove that it had developed justifiable reliance upon any representation by her before or after the issuance of the pre-approved credit card, thus reducing the probability of any actual reliance by AT&T on any such representations. *Field*, 516 U.S. at 71-76.[7]

The undisputed evidence shows that (1) AT&T approved Mercer's loans and made the cash accessible to her prior to any implied representations made by her to repay the loans through the use of the credit card; (2) AT&T most likely did not actually rely on Mercer's card-use representations before it authorized her ATM loans; (3) any actual reliance by AT&T, as a sophisticated financial actor, on the mere use of the card was not justifiable because AT&T issued the card based on impersonal credit bureau credit history and credit "risk score" predictors, which included no information as to Mercer's current financial condition, solvency or ability to repay the loans contemplated;

---

[7]By listing the specific factors present in this particular case, I am not indicating (as Judge Barksdale suggests) that, *inter alia*, credit card companies must cancel cards used frequently within the first billing cycle or that credit card companies may never approve cash withdrawals from a casino. I find not that these factors caused AT&T's reliance to be unjustified, but rather that they do not make AT&T's otherwise unjustified reliance justifiable.

(4) nothing in Mercer's use of the card after issuance did anything to justify AT&T's reliance on Mercer's implied by card use representations.

There is no doubt that AT&T made credit card loans to Mercer that she was legally obligated to pay but did not. This is not a suit on that contract or debt, however. Under section 523 of the Bankruptcy Code, to deny Mercer a discharge AT&T was required to prove that Mercer knowingly made false representations, which AT&T actually and justifiably relied upon, and which caused AT&T to lend her the money. The evidence is clear and undisputed that AT&T failed to prove that it actually relied upon, much less justifiably relied upon, any representation by Mercer that caused AT&T to make the credit card loans available to Mercer. Accordingly, because AT&T manifestly failed to prove all of the elements of fraud required by law, I join in affirming the judgment of the bankruptcy court.

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting:

I am *not* able to agree with the approach by either of my colleagues for resolving the issue presented by this appeal. Although the amount at stake is relatively small, the issue is exceptionally important. The analysis for determining whether credit card debt is dischargeable in bankruptcy has enormous implications, not only for credit card issuers, but also for millions of credit card users. Moreover, neither the card's being pre-approved, nor its use in large part for gambling, should alter the standards for representations and justifiable reliance *vel non*.

According to a recent newspaper article, "bank, retail and credit-card industry advocates estimate consumer bankruptcies cost their businesses about $40 billion a year". Dawn Kopecki & Jeffrey Taylor, *House, Senate Diverge on Bills for Bankruptcy*, WALL ST. J., 4 Feb. 2000, at A20. As expected, that cost is passed along to users of those services. Bankruptcies are said to cost each United States household $400 annually, in part because, in order to recoup their losses from bankrupt cardholders, credit card companies increase interest rates for all of their customers. Julie Hyman, *Senate Set to Pass Legislation to Curb Bankruptcy Abuse*, WASH. TIMES, 2 Feb. 2000, at

-18-

B8.

Our panel's divergent views as to the proper analysis for dischargeability of credit card debt mirror the inconsistencies reflected in the opinions of other courts that have addressed this issue.[8]  Among those courts are some of the bankruptcy and

_____

[8]*See, e.g.*, ***Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)***, 141 F.3d 277, 281 (6th Cir.) (use of credit card is implied representation of intent, but *not* ability, to repay), *cert. denied*, 525 U.S. 978 (1998); ***Anastas v. American Sav. Bank (In re Anastas)***, 94 F.3d 1280, 1285 (9th Cir. 1996) (credit card transaction is unilateral contract between cardholder and issuer consisting of cardholder's promise to repay and issuer's performance by reimbursing merchant who accepted credit card in payment; use of card is representation of intent, but *not* ability, to repay); ***Citibank (S.D.), N.A. v. Eashai (In re Eashai)***, 87 F.3d 1082, 1088 (9th Cir. 1996) (adopting 12 non-exclusive factors for determining whether debtor had subjective intent to deceive); ***Manufacturer's Hanover Trust Co. v. Ward (In re Ward)***, 857 F.2d 1082, 1085 (6th Cir. 1988) (unless credit card issuer conducts credit check before issuing card, it assumes risk debtor will fail to pay for subsequent charges); ***First Nat'l Bank of Mobile v. Roddenberry***, 701 F.2d 927, 932-33 (11th Cir. 1983) (concealment of inability to pay *not* actionable under Bankruptcy Act predecessor to § 523(a)(2)(A); credit card issuer assumes risk of non-payment until issuer unconditionally revokes cardholder's right to further possession and use of card); ***Universal Card Servs. v. Pickett (In re Pickett)***, 234 B.R. 748, 755 (Bankr. W.D. Mo. 1999) (use of credit card is express representation of both intent and ability to repay charge); ***AT&T Universal Card Servs. Corp. v. Reynolds (In re Reynolds)***, 221 B.R. 828, 837 (Bankr. N.D. Ala. 1998) (use of credit card is promise to pay in future, *not* implied representation of present intent and actual ability to pay); ***AT&T Universal Card Servs. v. Alvi (In re Alvi)***, 191 B.R. 724, 726 (Bankr. N.D. Ill. 1996) ("use of a credit card, in itself, does *not* constitute representation or statement which is capable of being true or false" (emphasis added)); ***GM Card v. Cox (In re Cox)***, 182 B.R. 626, 636 (Bankr. D. Mass. 1995) (§ 523(a)(2)(A) does *not* encompass "implied misrepresentation of intent to pay when both the representation and the absence of intent to pay must be based upon inference").

district courts in our circuit.[9]

[9]*See, e.g.,* **East v. AT&T Universal Card Servs. Corp.**, 1999 WL 425886, at *5 (N.D. Tex. 1999) (debtor's subjective fraudulent intent may "be inferred from objective facts suggesting ... debtor knew, or should have known, at the time the credit card was used, that the debtor was insolvent and lacked the ability to repay the charge"); **AT&T Universal Card Servs. v. McLeroy (In re McLeroy)**, 237 B.R. 901, 903-05 (Bankr. N.D. Miss. 1999) (use of credit card was representation that debtor would honor cardmember agreement; totality of circumstances, including 12 objective factors, used to determine whether debtor had fraudulent intent); **Universal Card Servs. Corp. v. Akins (In re Akins)**, 235 B.R. 866, 872-74 (Bankr. W.D. Tex. 1999) (applying "commercial entrapment" theory, credit card debt dischargeable because issuer's extension of credit was result of its own negligent lending practices and industry's negligent use of faulty FICO (risk) score system); **LA Capitol Fed. Credit Union v. Melancon (In re Melancon)**, 223 B.R. 300, 311, 324, 329-32 (Bankr. M.D. La. 1998) ("[w]hen the card holder inserts the card into an ATM, he is, in one step, asking for a loan and promising to repay it if it is obtained"; "inability to pay coupled with proof of the debtor's knowledge of inability to pay is sufficient to establish fraud"; although creditor has *no* duty to investigate, creditor who lends money in a casino cannot justifiably rely on debtor's promise to repay); **Sears, Roebuck & Co. v. Hernandez (In re Hernandez)**, 208 B.R. 872, 877 (Bankr. W.D. Tex. 1997) ("[p]assively extending credit in itself is not reliance ... nor can the court assume that a creditor relied on any alleged representation"); **Household Credit Servs., Inc. v. Walters**, 208 B.R. 651, 654 (Bankr. W.D. La. 1997) (use of credit card is implied representation regarding repayment; if issuer justified in relying on debtor's creditworthiness when card issued, reliance thereafter is presumptively justifiable unless some event occurs to rebut that presumption); **Bank One Columbus, N.A. v. McDaniel (In re McDaniel)**, 202 B.R. 74, 78 (Bankr. N.D. Tex. 1996) ("use of a credit card to incur debt in a typical credit card transaction involves no representation, express or implied", and "creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation"); **AT&T Universal Card Servs. v. Samani (In re Samani)**, 192 B.R. 877, 879-80 (Bankr. S.D. Tex. 1996) (creditor cannot establish fraud based on implied representation of intent and ability to pay based on mere use of credit card; instead, court considers objective totality of circumstances; reliance by creditor justified based on debtors' prior sporadic payment of at least minimum payment due); **First Deposit Credit Servs. Corp. v. Preece (In re Preece)**, 125 B.R. 474, 477 (Bankr.

Although Congress is considering bankruptcy reform legislation, it does *not* address the standard for determining credit card debt dischargeability. *See* H.R. 833, 106th Cong., 1st Sess. (1999); S. 625, 106th Cong., 2d Sess. (2000). Accordingly, rehearing en banc is necessary and appropriate for this exceptionally important issue.

A.

Section 523(a)(2)(A) excepts from discharge "any debt ... for money ... to the extent obtained by ... false pretenses, a false representation, or actual fraud". 11 U.S.C. § 523(a)(2)(A). Our court has applied different, but somewhat overlapping, elements of proof for actual fraud, as opposed to false pretenses/representation. *See* **RecoverEdge L.P. v. Pentecost**, 44 F.3d 1284, 1292-93 (5th Cir. 1995).[10]

---

W.D. Tex. 1991) (use of credit card is implied representation of present intention and ability to repay); **City Nat'l Bank of Baton Rouge v. Holston (In re Holston)**, 47 B.R. 103, 109 (Bankr. M.D. La. 1985) (credit card debt incurred prior to notification that account was closed is dischargeable, but portion occurred thereafter non-dischargeable); **Central Bank v. Kramer (In re Kramer)**, 38 B.R. 80, 82 (Bankr. W.D. La. 1984) (creditor proves false misrepresentation "if it can show that the defendant purchased goods by means of the credit card and that the purchases were made at a time when the debtor either did not have the means to or did not have the intent to pay for the goods"); **Ranier Bank v. Poteet (In re Poteet)**, 12 B.R. 565, 567 (Bankr. N.D. Tex. 1981) (purchase of merchandise by credit card is implied representation to issuer of card that buyer has means and intention to pay for purchase).

[10]The predecessor to § 523(a)(2)(A) did *not* include actual fraud as a basis for nondischargeability. **Davison-Paxon Co. v. Caldwell**, 115 F.2d 189, 191-92 (5th Cir. 1940), *cert. denied*, 313 U.S. 564 (1941), held that a debt created by fraud (obtaining credit through

The false pretenses/representation prongs require the creditor to prove the debtor made "(1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the other party".  *Id*. at 1293 (brackets, internal quotation marks, and citation omitted).

The actual fraud prong requires showing:  (1) the debtor made representations; (2) she knew they were false when made; (3) she made them with the intent to deceive the creditor; (4) the

_____

concealment of insolvency and present inability to pay) was dischargeable because nondischargeability for false pretenses or representations under the Bankruptcy Act required proof of an overt false pretense or misrepresentation; concealment was insufficient. As noted in **Sears, Roebuck & Co. v. Boydston (Matter of Boydston)**, 520 F.2d 1098, 1101 (5th Cir. 1975), "[t]he rationale underlying **Davison-Paxon** has been severely eroded in the modern world of credit transactions and the decision has been the subject of much criticism".  Nevertheless, it has *not* been overruled, and has caused considerable confusion among the bankruptcy courts in our circuit.  Our en banc court should resolve that confusion. *See, e.g.,* **In re Melancon**, 223 B.R. at 312-15 (discussing **Davison-Paxon** at length and concluding that it is obsolete due to Bankruptcy Code's addition of actual fraud and Supreme Court's adoption of common-law interpretation); **In re Samani**, 192 B.R. at 879 (allowing creditor to establish fraud based on implied representation of intent and ability to repay based on credit card use would directly contravene **Davison-Paxon**); **ITT Fin. Servs. v. Hulbert (In re Hulbert)**, 150 B.R. 169, 175 (Bankr. S.D. Tex. 1993) (concluding that Code's addition of actual fraud has *no* effect on validity of **Davison-Paxon**); **In re Holston**, 47 B.R. at 107 (unnecessary to decide whether **Davison-Paxon** is still good law, because Code's addition of actual fraud as nondischargeability ground expands scope of nondischargeable debts to include those arising from intentional concealment or omission); **Louisiana Nat'l Bank of Baton Rouge v. Talbot (In re Talbot)**, 16 B.R. 50, 54 (Bankr. M.D. La. 1981) (bound by **Davison-Paxon**); **In re Poteet**, 12 B.R. at 568 (rejecting **Davison-Paxon** requirements as *not* relevant to credit card transactions).

creditor actually and justifiably relied on the representations;
and (5) the creditor sustained a loss as a proximate result of
the representations.  *Id*.

Judge Duhé applies the former; Judge Dennis, the latter.
Moreover, AT&T did *not* specify on which prong it based its
complaint.  Under either type, AT&T had the burden of proving the
elements by a preponderance of the evidence.  *Grogan v. Garner*,
498 U.S. 279, 287 (1991).

In the light of *Field v. Mans*, 516 U.S. 59 (1995), it is
questionable whether there is justification for our applying
different elements for § 523(a)(2)(A)'s false
pretenses/representation and actual fraud prongs.  *Field*, in
defining the justifiable reliance element for actual fraud,
relied on the RESTATEMENT (SECOND) OF TORTS (1976), which did *not*
differentiate between false pretenses, misrepresentations, and
actual fraud.  *See Field*, 516 U.S. at 70-72.  In any event, the
elements for both types of actions being similar,
dischargeability will be analyzed using those for § 523(a)(2)(A)
actual fraud.

B.

Judge Duhé disposes of the case on the first element,
concluding that Mercer made *no* representations *each time* she used
the pre-approved credit card; and, that, because she made *no*
representations upon obtaining the card as the result of a pre-

23

approved solicitation, there were *no* representations upon which AT&T could actually or justifiably rely.

Obviously, this theory makes it virtually impossible for any issuer of a pre-approved credit card to prevail in a § 523(a)(2)(A) action.  And, because the theory does *not* consider the debtor's intent in incurring credit card debt, it is likely to result in the discharge of fraudulently-incurred debts, contrary to the language and purpose of § 523(a)(2)(A).  *See Grogan*, 498 U.S. at 286-87 ("fresh start" policy of Bankruptcy Code is for benefit of "honest but unfortunate" debtors, *not* perpetrators of fraud); *Chevy Chase Bank, FSB v. Briese (In re Briese)*, 196 B.R. 440, 449 (Bankr. W.D. Wis. 1996) ("While the bankruptcy code is to be construed liberally in favor of the debtor, it is also to be fair to creditors.").

Moreover, this theory could also have the unintended consequence of encouraging irresponsible and dishonest debtors to go on unrestrained spending sprees, until they have exhausted the credit limits of their accounts, secure in the knowledge their debts will be forgiven in bankruptcy court, as long as they wait at least 60 days before filing the petition.  *See* 11 U.S.C. § 523(a)(2)(C) (consumer debt for luxury goods or services, or cash advances aggregating more than $1075, within 60 days before filing petition presumptively nondischargeable).  Concomitantly, adoption of this theory undoubtedly would result in increased

credit costs for millions of honest card users.

Finally, because Mercer did *not* rely on this theory or urge
its application, adoption of this theory is especially troubling.
In closing argument at the trial of the adversary proceeding in
bankruptcy court, Mercer's counsel stated he was *not* urging
adoption of the "assumption of risk" theory because "in all
fairness it goes a little bit too far".  And, in her appellate
brief, Mercer implicitly concedes that, each time she used the
card, she made a representation of intent to pay the debt
incurred.    Judge Duhé rejects the so-called "implied
representation" theory urged by AT&T.  Under it, with each use of
a credit card, the debtor represents she intends to repay the
amount charged.  He does so on the grounds that, in deciding to
extend credit to Mercer before she made any representations, AT&T
assumed the risk of non-payment of charges incurred by Mercer
through her subsequent card-use; and the theory would improperly
shift the burden of proof in § 523(a)(2)(A) cases, by making the
debtor a guarantor of her financial condition.

The first ground for rejection of AT&T's "implied
representation" theory is a variant of the much-criticized
"assumption of the risk" theory adopted by the Eleventh Circuit
in *First Nat'l Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932-

33 (11th Cir. 1983).[11]  The Bankruptcy Code should *not* be
interpreted to require a creditor who investigates a debtor's
credit history prior to making a pre-approved solicitation, as
AT&T did in this case, to assume the risk of the debtor
committing fraud in subsequently using the card.  "Rather, the
credit card transaction (like any other lending relationship) is
premised upon the notion that both parties will act in good
faith.  Thus, the debtor is expected to make 'bona fide' use of
the card and *not* engage in fraud."  ***In re Briese***, 196 B.R. at 449
(emphasis added).

Furthermore, the assumption of the risk theory ignores the
nature of credit card transactions.  More appropriate is the
position of those courts which have viewed "each individual
credit card transaction as the formation of a unilateral contract

---

[11]For criticism of the assumption of the risk theory, *see* ***AT&T Universal Card Servs. Corp. v. Searle***, 223 B.R. 384, 389 (D. Mass. 1998) (theory "advantages the dishonest and deceptive debtor"); ***In re Briese***, 196 B.R. at 449 (theory "unsatisfactory, primarily because dishonest debtors may manipulate its mechanical distinction between debts incurred before and after credit privileges are revoked"; "creditor does not 'assume the risk' that the debtor is dishonest"); ***Chase Manhattan Bank, N.A. v. Ford (Matter of Ford)***, 186 B.R. 312, 318 n.8 (Bankr. N.D. Ga. 1995) ("many courts have criticized the Eleventh Circuit's approach as going to an extreme, tipping the scales so far in favor of debtors that very few credit card debts will qualify as nondischargeable"); ***In re Cox***, 182 B.R. at 634 (theory "too judgmental to support a court decision purporting to apply a statute"); ***In re Preece***, 125 B.R. at 477 (theory "places credit card issuers in a virtually impossible position with respect to credit card charges made prior to revocation of the card" (internal quotation marks and citation omitted)).

between the card holder and card issuer consisting of the following promise in exchange for performance:  the card holder promises to repay the debt plus to periodically make partial payments along with accrued interest and the card issuer performs by reimbursing the merchant who has accepted the credit card in payment". ***Anastas v. American Sav. Bank (In re Anastas)***, 94 F.3d 1280, 1285 (9th Cir. 1996); *see also* ***AT&T Universal Card Servs. Corp. v. Searle***, 223 B.R. 384, 389 (D. Mass. 1998) (adopting ***Anastas*** unilateral contract approach because it "is consistent with the notion that a representation can be made by words or conduct and recognizes representation as inherent in the transaction" (citing RESTATEMENT (SECOND) OF TORTS, § 525, comment b (1976)).

Moreover, the assumption of the risk theory is inconsistent with the common law, as expressed in the RESTATEMENT (SECOND) OF TORTS. *See* RESTATEMENT (SECOND) OF TORTS, § 530(l) ("representation of the maker's own intention to do or *not* to do a particular thing is fraudulent if he does *not* have that intention" (emphasis added)); ***id.***, comment c ("intention to perform the agreement may be expressed but it is normally merely to be implied from the making of the agreement").  Accordingly, when Mercer used her AT&T card to make a purchase or obtain a cash advance, she represented her intent to perform her obligation under the cardmember agreement, *i.e.*, to  repay the debt by making at least

the minimum monthly payment.

The second ground relied on by Judge Duhé for rejecting AT&T's "implied representation" theory seems to be based on an assumption that the theory encompasses not only a representation of *intent* to repay, but also a representation of *ability* to do so. *See **Sears, Roebuck & Co. v. Hernandez (In re Hernandez)***, 208 B.R. 872, 877 (Bankr. W.D. Tex. 1997) (rejecting "implied representation" theory based on assumption that, under that theory, card-use represented *not only an intent, but also the ability, to repay*); ***In re Briese***, 196 B.R. at 448-50 (rejecting "implied representation" of intent and ability to pay theory for reasons similar to those expressed by Judge Duhé, but holding that, in using card, debtor makes express representation — a "promise to pay for the credit advanced"); ***Chase Manhattan Bank, N.A. v. Ford (Matter of Ford)***, 186 B.R. 312, 317 (Bankr. N.D. Ga. 1995) (criticizing "ability-implying prong" of "implied representation" theory).

Even if card-use could be understood as a representation of *not* only an intent to repay, but also the ability to do so, the latter is *not* actionable under § 523(a)(2)(A). It exempts from discharge "any debt ... for money ... to the extent obtained by ... false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's ... financial condition*". 11 U.S.C. § 523(a)(2)(A) (emphasis added).

28

Accordingly, the representation element is properly confined to encompassing only a statement of *intent to repay*.[12]  This makes consideration of the *ability to pay* but one of many factors relevant to whether the representation was false *and* made with the subjective intent to deceive.[13]

---

[12]*See* **In re Rembert**, 141 F.3d at 281 ("use of a credit card represents either an actual or implied intent to repay the debt incurred"); **In re Anastas**, 94 F.3d at 1285 ("[w]hen the card holder uses his credit card, he makes a representation that he intends to repay the debt"); **Chevy Chase Bank FSB v. Kukuk (In re Kukuk)**, 225 B.R. 778, 785 (10th Cir. B.A.P. 1998) ("use of a credit card creates an implied representation that the debtor intends to repay the debt incurred thereby, but does not create any representation regarding the debtor's ability to repay the debt"); **American Express Travel Related Servs. Co. v. Christensen (In re Christensen)**, 193 B.R. 863, 866 (N.D. Ill. 1996) ("debtor's use of a credit card is a representation that he or she will pay off the debt at some point in the future"); **In re Melancon**, 223 B.R. at 311 ("[w]hen the card holder inserts the card into an ATM, he is, in one step, asking for a loan and promising to repay it if it is obtained"); **In re Reynolds**, 221 B.R. at 837 (debtor's use of credit card is representation of "promise to pay under terms of the debtor's contract with the credit card issuer"); **In re Briese**, 196 B.R. at 450 ("[a]lthough the debtor may not speak directly to the credit card issuer when making a purchase or obtaining a cash advance, there is little doubt that the debtor makes a representation — namely, the promise to pay for the credit advanced"); **Chase Manhattan Bank v. Murphy (In re Murphy)**, 190 B.R. 327, 332 (Bankr. N.D. Ill. 1995) ("the use of a credit card is a representation regarding future action").

[13]*See, e.g.*, **In re Eashai**, 87 F.3d at 1091 (considering debtor's financial condition, including fact that monthly expenses exceeded income when credit card charges made, as one factor for inferring intent to defraud); **In re Reynolds**, 221 B.R. at 839 (debtor's "reliance upon ... speculative financial arrangements appears to be a reckless disregard of the truth of his ability to make the minimum monthly payments"); **AT&T Universal Card Servs. Corp. v. Pakdaman**, 210 B.R. 886, 889 (D. Mass. 1997) ("A debtor's ability to repay at the time he or she incurs indebtedness may of course be circumstantial evidence on the issue of intent, but it is only one

In this light, the "implied representation" theory does *not* have the undesirable consequence of making the debtor the guarantor of her financial condition. *See* **Briese**, 196 B.R. at 450 & n.16 ("implied representation" is inappropriate, because debtor's card-use "constitutes an actual representation of future performance", "namely, the promise to pay for the credit advanced"; when ability to pay is *not* treated as part of the representation made with card-use, there is *no* "risk that the debtor becomes the guarantor of his or her financial condition").

C.

Judge Dennis concludes correctly, in my opinion, that, each time she used her AT&T card, Mercer made a representation of an intent to repay. We part ways, however, because he would affirm the discharge on the basis that AT&T failed to prove it actually and justifiably relied on such representations.

Judge Dennis agrees with Judge Duhé that a credit card issuer *cannot* justifiably rely on any representation made by a cardholder *if* the card was pre-approved and, prior to card-

---

factor."); **In re Murphy**, 190 B.R. at 332 n.6 (ability to pay "is merely one factor to be considered in determining whether the debtor intended to repay", but "[a]lone ... does not establish fraudulent intent"); **Household Credit Servs., Inc. v. Jacobs (In re Jacobs)**, 196 B.R. 429, 434 (Bankr. N.D. Ind. 1996) (relying on fact that, when debtor incurred charges, debtor was unable to pay monthly payments on pre-existing debts and monthly income was less than expenses as factor supporting conclusion that debtor subjectively intended to defraud creditor); **Matter of Ford**, 186 B.R. at 320 ("debtor's inability to pay the debt at the time that he incurred it may present indicia of an intent to defraud").

issuance, the issuer obtained *no* direct financial information from the debtor.  But, in his view, the creditor's initial assumption of risk does *not* prevent it from justifiably relying on future representations *if* the debtor has established a history of prompt payment.    Nevertheless, he concludes, as a matter of law, that, because AT&T received no direct financial information from Mercer prior to card-issuance, but instead based its decision to issue the card on the credit bureau screening process, AT&T assumed the risk that Mercer would *not* repay the charges, and could *not* justifiably rely on her implied promises to repay loans incurred through her card-use.  The "justifiable reliance" standard applied by Judge Dennis is far more stringent than that by *Field*, which, as Judge Duhé notes, does *not* require an investigation.  *See **LA Capitol Fed. Credit Union v. Melancon (In re Melancon)**, 223 B.R. 300, 328-29 (Bankr. M.D. La. 1998) (requiring credit card issuer to demonstrate that it examined cardholder's credit history before issuing card impermissibly contradicts Restatement rule adopted in **Field***).

In adopting the justifiable reliance standard, **Field** "look[ed] to the concept of 'actual fraud' as it was understood in 1978 when that language was added to § 523(a)(2)(A)", as reflected in "the most widely accepted distillation of the common law of torts":  the RESTATEMENT (SECOND) OF TORTS (1976).  516 U.S. at 70.  Under the Restatement, "a person is justified in relying on

a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation'". *Id*. quoting RESTATEMENT (SECOND) OF TORTS, § 540).  The Court cited the Restatement's illustration that "a buyer's reliance on th[e] actual representation [of a seller of land who says it is free of encumbrances] is justifiable, even if he could have 'walk[ed] across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage". *Id*. (quoting RESTATEMENT (SECOND) OF TORTS, § 540).

Furthermore, *Field* pointed out that "contributory negligence is *no* bar to recovery because fraudulent misrepresentation is an intentional tort".  *Id*. (emphasis added).  Although "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case", *id*. at 71, this does *not* mean that, simply because AT&T is a large corporation and has the ability to obtain financial information from the debtor, it *cannot* justifiably rely on her representation of an intent to repay the charges she incurred each time she used her card.

*Field*'s quotations from other tort treatises indicate clearly that the justifiable reliance standard Judge Dennis would impose is *not* consistent with the Court's view of the scope of that standard.  For example, 1 F. HARPER & F. JAMES, LAW OF TORTS § 7.12, pp. 581-83 (1956), quoted in *Field*, states:

> [T]he plaintiff is entitled to rely upon
> representations of fact of such a character
> as to require some kind of investigation or
> examination on his part to discover their
> falsity, and a defendant who has been guilty
> of conscious misrepresentation can *not* offer
> as a defense the plaintiff's failure to make
> the investigation or examination to verify
> the same[.]

*Id*. at 72 (emphasis added).

Thus, even assuming AT&T could have obtained financial information directly from Mercer prior to issuing her the card, that does *not* preclude finding it was justified in relying on the information it obtained, which raised *no* "red flag" requiring further investigation. Moreover, as hereinafter discussed, the record does *not* support Judge Dennis' statement that the credit bureau information obtained by AT&T prior to card-issuance "included *no* information as to Mercer's current financial condition, solvency or ability to repay the loans contemplated". (Emphasis added.)

At trial, an AT&T bankruptcy specialist testified that the screening process began six to seven months prior to AT&T's solicitation to Mercer. In the first screening, the credit bureau produced a list of prospects based on criteria specified by AT&T, including total revolving debt, delinquencies, bankruptcies, judgments, utilization of existing credit, and historical delinquency periods over 60-90 days. The credit bureau determined a risk score ("FICO" score) for each prospect.

The FICO score is a credit bureau model, developed by Fair Isaacs Co., which predicts the probability of an account being delinquent for 60-90 days or more within a one-year period. The maximum possible FICO score is 900; the lowest, 0. AT&T requires a minimum score of 680 as a condition for solicitation. Mercer's was 735, which AT&T's bankruptcy specialist evaluated as "very good".

The list of prospects derived from the initial screening was then referred to an outside vendor. It eliminated prospects who had requested *not* to be solicited, duplicates, and prospects located in high fraud areas. The list was then matched against internal risk and scoring models used by AT&T; the list of prospects retained after that process was then returned to the credit bureau for a second screening to ensure there had been *no* changes in a prospect's credit standing or credit history since the first screening.

The prospects who survived this second screening (including Mercer) received an offer for a pre-approved credit card, as AT&T is required to do, according to AT&T's representative, under the Fair Credit Reporting Act. When Mercer accepted the offer, AT&T checked the information she supplied on the acceptance form to ensure it matched the information in its database. Then, a third credit bureau screening was performed to determine whether there had been any deterioration in credit history, in which case AT&T

could either withdraw the offer or offer a lower line of credit.

In the light of that testimony, it is simply inaccurate to say AT&T had *no* information about Mercer's ability to pay when it issued her a credit card.

Affirmance for the reasons stated by Judge Dennis is also inappropriate because, although the bankruptcy court correctly stated the applicable justifiable reliance standard, 220 B.R. at 323, it did *not* correctly apply it in determining AT&T did *not* actually or justifiably rely on any representations by Mercer. It held that, even assuming AT&T actually relied on any representations by Mercer, such reliance was *not* justifiable "in light of the incomplete nature of the credit information obtained by AT&T". *Id.* at 327. The bankruptcy court suggested that, "[i]f AT&T does not want its cardholders to use cash advances for gambling purposes and wants such uses to be non-dischargeable, why not put a specific restriction on this use in the cardholder agreement". *Id.* at 328. During the trial, the bankruptcy judge suggested a number of questions AT&T should have asked Mercer before issuing her a credit card.[14] The court's opinion and

---

[14]The bankruptcy court asked AT&T's representative why AT&T had *not* asked Mercer where she worked, how many children she had, and whether she was married; and why it did *not* prohibit cardholders' use of ATM machines at casinos. At the conclusion of the adversary proceeding, the court suggested that, in addition to relying on credit bureau information and FICO scores, credit card companies could ask whether, among other things, the debtor: has any problem

remarks reflect it imposed a much higher standard than justifiable reliance.

Instead, whether AT&T actually and justifiably relied on Mercer's representations of intent to pay through her card-use is a question of fact. *See **Coston v. Bank of Malvern (Matter of Coston)**, 991 F.2d 257, 260 (5th Cir. 1993) (en banc) (pre-**Field** case holding that reasonable reliance is question of fact). The bankruptcy court, applying the correct legal standard, should make that determination on remand.

Judge Dennis further concludes that nothing in AT&T's experience with Mercer as a cardholder, subsequent to card-issuance, could justify a belief it had acquired a more substantial basis for its reliance upon her representations than it had when it issued the card. In support, he cites the following factors:

> (1) fourteen of Mercer's transactions were cash loans, several of which were made within a casino; (2) Mercer borrowed the maximum cash advance amount within thirty one days after receipt of the card; (3) Mercer had developed no history of payment or good standing with [AT&T] (Mercer had only made one payment of $25); [and] (4) nineteen days after issuance, [AT&T]'s own computer had red-flagged the use of Mercer's credit card

---

with gambling; owes any gambling debts; has had any gambling losses or winnings over the last several years; has other credit cards and, if so, the balance due; has a savings account and, if so, the balance; has a second job and, if so, why. The court suggested further that credit card companies should be required to exercise due diligence.

for excessive transactions.

Judge Dennis states that he does *not* find that the cited "factors *caused* AT&T's reliance to be unjustified, but rather, that they do not *make* AT&T's otherwise unjustified reliance justifiable". AT&T does *not*, however, rely on any of the factors cited by Judge Dennis to demonstrate justifiable reliance. In any event, as hereinafter discussed, *none* of the cited factors supports a conclusion that AT&T did *not* actually or justifiably rely on Mercer's representation, *each time she used the card*, that she intended to repay the charge incurred.

*1. Fourteen transactions were cash loans, several of which were made within a casino.* Although Mercer used the card to obtain 14 cash advances, only four (three on 23 November and one on 24 November, totaling approximately $1350) could be identified as occurring within a casino; nine (one on 28 November, three on 1 December, three on 10 December, and two on 11 December, totaling approximately $1300) are shown as having been obtained from an automatic teller machine at Peoples Bank, 676 Bayview, Biloxi, Mississippi; and one ($81 on 28 November) is shown as having been obtained from "STB SO. MISSIS", at 854 Howard, Biloxi, Mississippi. In any event, the fact that some of the cash advances were obtained at a casino is irrelevant in determining whether AT&T justifiably relied on Mercer's representation that she intended to repay those loans. In the

first place, the billing statement reflects that, although the advances were obtained by Mercer at the casino on 23 and 24 November, they were *not* posted until 27 November.  As AT&T's representative explained at trial, the date a transaction is posted to a cardholder's account is the date AT&T receives an electronic transfer notification from the clearing bank.  There was *no* evidence that AT&T had the ability to instantaneously determine, at the time Mercer inserted her card into the ATM, that she was in a casino.

Moreover, there is *no* basis for, as a matter of law, treating cash advances obtained at casinos differently from cash advances obtained at other locations, such as banks or stores. Although Mercer testified that she used all of the cash advances obtained from AT&T for gambling, she obtained many of them at a bank rather than a casino.  Moreover, the trial testimony established that AT&T has *no* control over ATM locations and is *not* affiliated with the entity which operated the casino ATM from which Mercer obtained cash advances.

The record contains *no* empirical or other evidence to support a rule precluding credit card issuers from justifiably relying on a cardholder's promise to repay a cash advance simply because it was obtained within a casino.[15]  Common sense suggests

---

[15]Some courts have criticized the credit card industry for allowing debtors to use credit cards at casinos, and have held that credit card issuers *cannot* justifiably rely on representations of

that *not* everyone who uses a credit card to obtain a cash advance at a casino does so in order to obtain money for gambling, or does so  because she is losing and has *no* other source of funds with which to gamble.  For example, if given a choice, some might consider it safer or more convenient to enter a casino to obtain cash, rather than do so at an ATM outside a bank, where there is *no* security and far greater potential for being robbed.  Or, someone might be in a casino hotel because a convention is being held there or entertainment provided and, without using it for gambling, obtain a cash advance at an ATM in the casino to use for various monetary needs, such as dining.  In short, obtaining cash from such an ATM does *not* automatically translate into that cash being used for gambling.

*2.  Mercer borrowed the maximum cash advance amount within 31 days after receipt of the card.*  This factor supports, rather than detracts from, finding justifiable reliance.  Mercer used

---

intent to pay when their cards are used to obtain cash advances at casinos.  *See, e.g.*, **In re Melancon**, 223 B.R. at 329 & nn. 42, 43 (noting "obvious stupidity of an institutional policy that sanctions the decision to lend money in a casino to borrowers who gamble and are willing to do so with somebody else's money"; "[i]f a lender allows a holder to borrow money inside a casino, then the lender must be charged with two bits of information:  the money will be used for gambling, and either the borrower has been losing or he has no money of his own with which to gamble"; "[a] creditor that lends money inside a casino is not justifiably relying on anything"); **In re Reynolds**, 221 B.R. at 840 ("[c]redit card issuers which allow cash advances on ATMs in gambling casinos are on notice their customers may use the money to gamble, and presumably that some gamblers may be poor credit risks").

her available credit within the first billing cycle, before she received her first statement, giving AT&T *no* opportunity to evaluate her creditworthiness based on a history with it. Up until 11 December, the last day Mercer used the card, when she exceeded her $3,000 credit limit by approximately $186, her card-use was within the terms of the cardmember agreement. By using the card, she signified her acceptance of the terms of that agreement, including the term which required her to repay AT&T. The AT&T representative testified that, as long as a cardholder is using the card in accordance with the terms of the cardmember agreement, AT&T is obligated to honor it.

*3. Mercer had developed no history of payment or good standing with AT&T.* As stated, Mercer exhausted her credit limit during the first billing cycle. Requiring that a cardholder have a history of timely payments before the issuer can justifiably rely on the cardholder's representation of an intent to pay would result in the discharge of all credit card debt incurred by cardholders within at least the first month of use. Such a rule would encourage irresponsible and dishonest debtors to "max out" their credit limits within the first billing cycle in order to preclude nondischargeability. It could also have the unintended consequence of spurring credit card issuers to establish such low credit limits that credit cards would serve *no* useful purpose to many card users.

*4. Nineteen days after issuance, AT&T's own computer had red-flagged the use of Mercer's credit card for excessive transactions.*[16]

This factor is *not* particularly relevant. AT&T's representative testified that: the account was reviewed by an AT&T employee, who determined that the transactions were *not* egregiously excessive and cleared Mercer's account for further use; and, because the charges were within the terms of the cardmember agreement, AT&T was obligated to honor it. Reliance on this factor could encourage prudent credit card companies to cancel cards when cardholders use them frequently within the first billing cycle, regardless of whether such use did *not* exceed the cardholder's credit limit.

D.

Based on the foregoing reasons, this case should be remanded to the bankruptcy court. Continuing to use § 523(a)(2)(A) actual fraud as the template, the following considerations for each of its five elements should come into play. Again, the five elements for such actual fraud are: (1) the debtor made representations; (2) when made, she knew they were false; (3)

---

[16]The bankruptcy court misstated that Mercer's account was flagged for excessive transactions nine days after issuance. *See AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 220 B.R. 315, 320 (Bankr. S.D. Miss. 1998) (stating AT&T representative testified Mercer's account was flagged for excessive use on 19 November 1995).

they were made with the intent to deceive the creditor; (4) it actually and justifiably relied on them; and (5) it sustained a loss as a proximate result of them.

For the first element, I would hold that, on each occasion Mercer used her AT&T credit card to make a purchase or obtain a cash advance, she expressly represented to AT&T her intent to repay the amount charged, in accordance with the terms of the cardholder agreement, by at least making the required minimum payment.

For the second and third elements, the bankruptcy court did *not* consider whether Mercer's representations were false when made, or whether she made them with the subjective intent to deceive AT&T. For such factual determinations, all of the facts and circumstances surrounding Mercer's card-use should, of course, be considered. Because a debtor rarely will admit credit card debt is incurred with the intention of *not* repaying it, the bankruptcy court should consider objective evidence of her state of mind.[17] I consider especially relevant her testimony that:

---

[17]*See, e.g.*, **In re Eashai**, 87 F.3d at 1090 ("Since a debtor will rarely admit to his fraudulent intentions, the creditor must rely on [objective factors] to establish the subjective intent of the debtor through circumstantial evidence."); **Citibank (S.D.), N.A. v. Michel**, 220 B.R. 603, 606 (N.D. Ill. 1998) ("Obviously the court must consider objective evidence that is probative of the debtor's intent to repay in addition to considering the debtor's demeanor, but the ultimate inquiry still seeks to determine the debtor's subjective intent"); **In re Briese**, 196 B.R. at 451 (because it is "difficult, if not impossible, for a plaintiff to present direct evidence of a debtor's intent to deceive[,] ... courts may

when she used the AT&T card, she did *not* have enough income from her employment to pay all of her living expenses and make the minimum payments on all of her credit cards; and she intended to use gambling winnings to meet those expenses.[18]

For the fourth element, and as stated, the bankruptcy court applied an incorrect legal standard in finding AT&T did *not* actually and justifiably rely on any representations by Mercer. I would use the standard of justifiable reliance applied in the Ninth Circuit: "the credit card issuer justifiably relies on a representation of intent to repay as long as the account is *not* in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable". *In*

---

legitimately utilize circumstantial evidence to ascertain debtor's intent").

[18]*See **In re Melancon***, 223 B.R. at 336-41 (discussing at length whether gamblers who hope to repay debts with gambling winnings have requisite intent to repay, and concluding that, although debtor "like all other gamblers, may have hoped that she would win a lot of money, ... [she] never intended to repay the cash advances"); ***In re Jacobs***, 196 B.R. at 434 (subjective intent to deceive established by proof that debtors obtained cash advances and purchases when they were unable to pay monthly payments on pre-existing debts and when their monthly income was less than their monthly expenses; they were in default on other debts when they incurred debts at issue, thus putting themselves in position of insolvence; and they had in excess of $45,000 in secured debt when they began to incur debt at issue); ***In re Preece***, 125 B.R. at 478 (debtor's professed intention to repay cash advances charged to credit card *not* held in good faith because he knew he did *not* have ability to repay them; "[a] debtor cannot ignore the reality of his financial situation and still maintain that he has a 'good faith intent' to repay").

**re Anastas**, 94 F.3d at 1286 (emphasis added).[19]

That standard is appropriate because it "recognizes the unique nature of credit card transactions, the ability of a cardholder to mask an actual financial condition by making minimum payments from whatever sources, and the credit card issuer's lack of access to the cardholder's present financial condition at the point of each transaction". *See* **Searle**, 223 B.R. at 391 (adopting Ninth Circuit's justifiable reliance standard). Facts relevant to that inquiry include: (1) AT&T's decision to offer Mercer a pre-approved credit card was based on an examination of her credit history — twice *before* she accepted the offer, and again *after* she accepted the offer and before it sent a card to her; (2) the terms of the cardmember agreement,

---

[19]Judge Dennis criticizes my quotation from **In re Anastas** for the Ninth Circuit's justifiable reliance standard, stating it is dictum and "not a complete or comprehensive statement of the Ninth Circuit's jurisprudence on justifiable reliance". In stating the standard, **In re Anastas** cited **In re Eashai**, 87 F.3d at 1091, in which the discussion of justifiable reliance was *not* dictum. Moreover, in a subsequent decision, the Ninth Circuit quoted that same language from **In re Anastas** in describing its standard. *See* **American Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)**, 104 F.3d 1122, 1126 (9th Cir. 1996) (quoting **In re Anastas**, 94 F.3d at 1286). In stating that I would adopt this standard, is *not* my intention to provide a complete or comprehensive statement of the Ninth Circuit's jurisprudence on justifiable reliance. Obviously, if a cardholder has established a history of payments with the creditor, justifiable reliance will be easier to prove. But, I do *not* interpret the Ninth Circuit's jurisprudence to require such a history; and, as discussed *supra*, I would *not* hold that the absence of such a history precludes finding justifiable reliance.

which provided that Mercer's card-use signified her acceptance of those terms, including the requirement that she repay the charges incurred, by at least making the minimum monthly payments; and (3) Mercer's exhausting her available credit limit within the first billing cycle, within the scope of the cardmember agreement *and before* AT&T had any reason to suspect that she would *not* repay the charges.

Finally, for the fifth element, I would hold that AT&T's loss (the unpaid charges) was proximately caused by its reliance on Mercer's promise, each time she used the card, to repay the charge incurred.[20]

For the foregoing reasons, I respectfully dissent and urge en banc consideration of this quite important case.

---

[20]*See* **Pakdaman**, 210 B.R. at 890 ("issuer's extension of credit constitutes both actual reliance and damages"); **In re Melancon**, 223 B.R. at 326 (in using credit card, debtor represents intent to repay; representation is made with intent to cause issuer to provide credit; and representation is cause in fact of issuer's decision to provide credit); **AT&T Universal Card Servs. Corp. v. Wong (In re Wong)**, 207 B.R. 822, 832 (Bankr. E.D. Pa. 1997) (creditor proved it sustained loss as proximate result of debtor's representations by establishing that, as direct result of debtor's use of credit card, debtor incurred debt that has *not* been paid).